VERNON HOVEN AND THORA HOVEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2903–69. Filed April 12, 1971.

---

*John R. Kline, Peter Meloy,* and *David N. Niklas,* for the petitioners.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions to tax under sections 6651(a)[1] and 6653(a), as follows:

| Year | Deficiency | Additions to tax | |
|------|------------|------------------|------------------|
| | | Sec. 6651(a) | Sec. 6653(a) |
| 1963 | $13,023.60 | $3,255.90 | $690.92 |
| 1964 | 4,149.81 | 1,037.45 | 257.58 |

The following issues are presented for decision:[2]

(1) Whether petitioners "held" certain real property "for more than 6 months" and, consequently, on its sale realized long-term capital gain within the meaning of section 1222(3); and

(2) What part of the lump-sum purchase price paid for two parcels of land is allocable to each for the purpose of computing their respective cost bases under section 1012.

### FINDINGS OF FACT

Vernon Hoven (hereinafter referred to as petitioner) and Thora Hoven, husband and wife, were legal residents of Missoula, Mont., at the time their petition was filed. They filed their joint income tax returns for 1963 and 1964 with the district director of internal revenue, Helena, Mont.

Petitioner is an attorney engaged in the practice of law in Montana. A substantial portion of his practice involves the purchase and sale of real estate.

On May 23, 1963, petitioner, as attorney for Inland Empire Trailer Parks, Inc. (hereinafter Inland Trailer), entered into a "Receipt and Agreement to Sell and Purchase" (hereinafter referred to as the May 23 agreement) with Albert N. Hefte (hereinafter Hefte), the seller, to purchase two parcels of land. One parcel (hereinafter sometimes referred to as the lower tract) consisted of 148 acres located in

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

[2] Petitioners have agreed, in substance, to the applicability of the additions to tax in respect of the amounts of any deficiencies found by the Court.

the northeast quarter of a section of land adjacent to southwest Missoula, Mont. The other parcel (hereinafter sometimes referred to as the upper tract) consisted of 120 acres comprising three-fourths of the southwest quarter of the same section.

The May 23 agreement provided, in part, as follows:

It is hereby agreed that the total purchase price is * * * $125,000.00 payable as follows: The earnest money * * * of * * * $1,000.00 [to be paid at this time] and the balance of the purchase price * * * of * * * $124,000.00 * * * On one land contract, with four deeds, to be paid and released according to Schedule # (1) attached hereto. * * *

Schedule No. (1) specified that an additional $4,000 would become due upon approval of the title. Thereafter, $20,000 was payable on September 15, 1963, and additional amounts were to become due at stated intervals. Upon the payment of these additional amounts on prescribed dates, deeds covering portions of the property were to be released to Inland Trailer. The May 23 agreement also provided:

2. The real property is to be conveyed by Warranty Deed * * *

3. Seller shall pay all of the taxes and assessments for 9/12ths of 1963 and prior years and Purchaser shall pay all taxes and assessments thereafter. Rents, insurance and interest on mortgage or contract indebtedness shall be pro-rated as of October 1, 1963. * * *

4. If Seller does not approve this sale within 10 days hereafter, or if Seller's title is not merchantable or insurable and cannot be made so within a reasonable time * * * then said earnest money * * * shall be returned to the Purchaser on demand and all rights of Purchaser terminated * * * but if said sale is approved by the Seller and Seller's said title is merchantable or insurable and Purchaser neglects or refuses to complete the purchase or shall fail to pay the balance of the purchase price as hereinabove provided, then said earnest money shall be forfeited to the Seller as liquidated damages and not as a penalty and this Agreement thereupon shall be of no further force or effect.

5. Possession shall be delivered Purchaser on or before the First day of October, 1963.

* * * * * * *

8. Special provisions: Purchaser intends to utalize [sic] this property for Trailer Park purposes. in [sic] the event of legal restrictions preventing such useage [sic] this purchase contract is void. * * *

On July 16, 1963, Hefte, as seller, and A. J. Rapp, as broker, signed a "Real Estate Broker's Closing Statement." This statement reflected "Purchaser's Debits" in the amount of $125,000, the purchase price, and "Purchaser's Credits" as follows:

Earnest money deposited_____ $1,000
Buyer's unpaid balance on contract_____ 120,000
Cash paid on closing_____ 4,000

Total credits_____ 125,000

Thereafter, on September 23, 1963, Hefte and Inland Trailer entered into a "Contract of Sale" (hereinafter sometimes referred

to as the September 23 contract) which provided that Hefte "agrees to sell and convey" and Inland Trailer "agrees to buy" and to pay $125,000 for the two parcels. The parties agreed to prorate the insurance, taxes, and assessments as of October 1, 1963. Inland Trailer agreed to "accept" the premises, including the dwelling and other buildings, "in the condition they now are"; "to keep and maintain all of said property in the condition it now is"; and to pay the consideration regardless of any loss, damage, or destruction to the improvements. If there should be a default by Inland Trailer, Hefte was given the election to declare the entire unpaid balance due within 30 days; and, upon payment of the balance due, Hefte was obligated to vest Inland Trailer with title to the property. In the event Hefte elected not to remedy a default by Inland Trailer in this manner, he could declare a forfeiture and, if he did so, the escrow agent, with whom deeds to designated parcels were to be deposited, was to return the deeds. The contract further provided that Inland Trailer was to pay the purchase price as follows:

Upon execution of the contract (receipt of which was
 acknowledged) _____ $5, 000
On or before Sept. 15, 1963_____ 20, 000
On Mar. 1, 1964_____ 25, 000
On or before July 1, 1964_____ 25, 000
On or before Jan. 1, 1965_____ 25, 000
On or before July 1, 1965_____ 25, 000

Hefte agreed to deliver one deed on the execution of the agreement and to deposit with an escrow agent four deeds covering specified portions of the two tracts; a designated deed was to be delivered to Inland Trailer upon payment of each of the last four amounts.

At this point, in actuality, petitioner was the buyer of the property, for he had paid Inland Trailer $5,000 for its rights under the September 23 contract and the use of Inland Trailer's name.

In early September 1963, prior to the execution of the September 23 contract, petitioner expended money for the purchase of blueprints of both parcels, and for an earnings projection on the property. The blueprints and the earnings projection were to be employed in applying for a loan to obtain funds for development of the land. During this same period, petitioner replaced some windows in the house located on the lower tract. He also moved some personal property onto the tract during the summer of 1963. He did not take possession of the property and move his family into the house, however, until the latter part of September 1963.

Prior to, and during, the summer of 1963, there was a steady increase in residential development in the area around Missoula. The lower and upper tracts lay to the southwest of the city, in an area

that had experienced a steady growth. The lower tract was located adjacent to another development project and contained access routes from the city. In addition, this tract was in close proximity to various utilities, including water and sewer systems, and was close to schools in the area. By contrast, the upper tract lay farther to the south, away from the current residential construction. Access roads were much more limited; available utilities were farther away, and sewerage problems hindered use of this tract for residential purposes.

On the same date that petitioner entered into the September 23 contract, he executed another contract for the sale of the lower tract to Steven D. Brodie and James L. Lee (hereinafter Brodie and Lee). The sales price for this 148-acre lower tract was originally $163,000; however, by a supplemental agreement the price was later reduced to $130,000 in consideration of the release of petitioner from an obligation to install a water system for a residential subdivision.

Of the 120 acres in the upper tract, petitioner, on March 4, 1964, sold 39 acres to Leonard Hagen and George P. Richter (hereinafter Hagen and Richter), who were builders and subdividers. The sales price for this 39 acres was $29,000, of which $5,000 was paid in 1964.

In 1965, petitioner reacquired the 39 acres from Hagen and Richter for $16,000, paying $6,000 in cash and $10,000 in equity in certain lots. Thereafter, in March 1965, he sold the entire upper tract to Brodie and Lee, the buyers of the lower tract, for a consideration finally fixed at $128,000.

On their 1963 income tax return, petitioners reported the sale of the lower tract to Brodie and Lee, employing a basis of $124,000 in computing the gain. In their 1964 income tax return, they did not report the sale of the 39 acres to Hagen and Richter.

Respondent, in his notice of deficiency, reallocated the $130,000 paid for the two parcels, determining bases of $88,894 for the 148-acre lower tract and $41,106 for the 120-acre upper tract, of which $13,359.45 was allocated to the 39 acres sold to Hagen and Richter in 1964. Accordingly, respondent determined that petitioner realized short-term capital gain in 1963 in the amount of $41,106 from the sale of the 148-acre lower tract. He also determined that petitioner realized short-term capital gain in 1964 in the amount of $2,696.64 from the sale of the 39 acres; in making this latter determination, respondent treated September 23, 1963, as the date of the acquisition of the two tracts for purposes of section 1222.

## ULTIMATE FINDINGS OF FACT

1. Petitioner acquired ownership of the two tracts of land on September 23, 1963, and his holding period for purposes of section 1222 began on that date.

2. Of the $130,000 cost basis attributable to the lower and upper tracts, $96,800 is allocable to the 148-acre lower tract, and $33,200 is allocable to the 120-acre upper tract.

## OPINION

Resolution of the issue of whether the gain realized on the sale of the 39 acres to Hagen and Richter on March 4, 1964, is taxable as long-term or short-term capital gain depends on the length of time during which petitioner "held" the property. If the property was held for more than 6 months, the profit realized from the sale is taxable as long-term capital gain; otherwise, the profit is taxable as short-term capital gain.[3]

Petitioner contends that his holding period commenced when he entered into the May 23 agreement. Respondent argues that the holding period did not begin until the September 23 contract was executed. We agree with respondent.

As explained in *McFeely* v. *Commissioner*, 296 U.S. 102, 107 (1935), the word "held" as it appears in section 1222 has been equated with "owned."

In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding. * * *

In determining the date of acquisition of the ownership of property, no hard-and-fast rules of thumb can be used, and no single factor is controlling. *Clodfelter* v. *Commissioner*, 426 F.2d 1391, 1393 (C.A. 9, 1970), affirming 48 T.C. 694 (1967). "Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property," *Ted F. Merrill*, 40 T.C. 66, 74 (1963), affirmed per curiam 336 F.2d 771 (C.A. 9, 1964); consequently, we must examine the transaction in its entirety. *Clodfelter* v. *Commissioner*, *supra*. The date of the passage of legal title is not the sole criteria; the date on which "the benefits and burdens or the incidents of ownership of the property" were passed must also be considered, *Ted F. Merrill*, *supra* at 74, and the legal consequence of particular contract provisions must be examined in the light of the applicable State law, *Peavey* v. *United States*, 214 F. Supp. 934 (D.Kan. 1963).

---

[3] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.
 For purposes of this subtitle—
 (1) SHORT-TERM CAPITAL GAIN.—The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income.
 * * * * * * *
 (3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, * * *

We find nothing in the Montana law which permits the conclusion that the May 23 agreement passed ownership of these properties to petitioner. Section 74–106, Mont. Rev. Codes Ann. (1947), provides:

Agreement to sell and buy. An agreement to sell and buy is a contract by which one engages to transfer the title to a certain thing to another, who engages to accept the same from him and to pay a price therefor.

The Montana Supreme Court, considering the predecessor of this section, which contained similar language, stated in *Wright Land & Investment Co.* v. *Even,* 57 Mont. 1, 186 Pac. 681, 683 (1919) :

The early case of *Ide* v. *Leiser,* 10 Mont. 5, 24 Pac. 695, * * * decided by this court * * * defines an agreement to sell as "a contract to be performed in the future, and, if fulfilled, results in a sale. It is preliminary to a sale, and is not the sale. Breaches, rescission, or release may occur by which the contemplated sale never takes place." Thus it is made clearly to appear that * * * [the agreement herein] did not effect a transfer of title, was not a sale, but only an executory agreement to buy.

See also *Callender* v. *Crossfield Oil Syndicate,* 84 Mont. 263, 275 Pac. 273, 276 (1929) ; cf. *Ryan* v. *Bloom,* 120 Mont. 443, 186 P.2d 879 (1947), certiorari denied 333 U.S. 874 (1948).

We think it quite apparent that the May 23 agreement was, within the meaning of this Montana statute, an "agreement to sell and buy," and was purely executory in nature and preliminary to the sale. The sale was not to be consummated if the "Seller's title * * * [was] not merchantable or insurable and * * * [could not] be made so within a reasonable time"; rather the purchaser's earnest money would be refunded, and all the rights under the agreement would be terminated. Similarly, if the purchaser defaulted, the earnest money would be forfeited as liquidated damages, and the agreement would thereupon "be of no further force or effect."[4] Also, the agreement was declared to be "void" if there were legal restrictions preventing the usage of the property for trailer park purposes. In addition, by its terms, the agreement contemplated the subsequent execution of a "land contract," together "with four deeds" which were to be released by the escrow agent according to a specified schedule. Thus, the May 23 agreement did not effect a passage of title; nor did it unconditionally obligate petitioner to pay the purchase price or Hefte to execute and deliver deeds of conveyance. Cf. *Morco Corporation* v. *Commissioner,* 300 F.2d 245, 246 (C.A. 2, 1962), affirming per curiam a Memorandum

---

[4] In *Wright Land & Investment Co.* v. *Even,* 57 Mont. 1, 186 Pac. 681, 684 (1919), the court said :

"Authorities abound in an unbroken line holding that, where a writing contains a provision that a fixed amount may be regarded as liquidated damages and as rent, it makes of such an instrument an obligation, executory in character, and not a sale. * * *"

Opinion of this Court; *Wiseman* v. *Scruggs*, 281 F. 2d 900 (C.A. 10, 1960).

Furthermore, petitioner acquired none of the burdens and benefits of ownership at the time the May 23 agreement was executed. Possession, an important factor to be considered in determining ownership, *Clodfelter* v. *Commissioner, supra* at 1395, was not delivered to him until approximately October 1, 1963. This was shortly after the execution of the September 23 contract and was the possession date specifically prescribed therein. Although petitioner presented evidence that he moved certain personal property onto the land prior to October 1, such evidence is not sufficient to show that he had possession. Nor did petitioner assume any of the liabilities for taxes and assessments, insurance, or other burdens associated with ownership of the land until October 1, 1963. *Clodfelter* v. *Commissioner, supra; Ted F. Merrill, supra.*

From all the evidence presented, we are convinced that petitioner did not become the owner of the two tracts of land until the September 23 contract was executed. At that time the sale was consummated; and, while delivery of the deeds of title to all except one portion of the land was delayed, there was an absolute and unconditional obligation on the part of the seller to place the other four deeds in escrow for delivery when scheduled payments were made. At that time, petitioner also acquired possession as well as the other benefits and burdens of ownership. *Ted F. Merrill, supra; Clodfelter* v. *Commissioner, supra.* Indeed, on the same date, he executed a contract to sell the lower tract to Brodie and Lee. Accordingly, petitioner had held the property less than 6 months when he made the March 4, 1964, sale, and his gain therefrom is short-term capital gain.[5]

As to petitioner's basis for computing the amount of his gain, the general rule is that the basis of property is its cost. Sec. 1012. "When a part of a larger property is sold," the cost or other basis of the entire property must be "equitably apportioned among the several parts." Sec. 1.61–6(a), Income Tax Regs. The proper allocation of the cost basis between the upper and lower tracts of land is thus a factual issue which depends upon all the relevant evidence.

Petitioner and respondent each introduced expert testimony concerning the value to be attributed to each parcel of property. All the experts were competent and thoroughly familiar with the area; all had considerable experience; and were well informed with respect to development trends in the area, location of the two tracts, potential for

---

[5] In *Commissioner* v. *Baertschi,* 412 F. 2d 494 (C.A. 6, 1969), reversing 49 T.C. 289 (1967), which arose under sec. 1034, the issue was whether ownership passed when a contract of sale was signed or when the deed was passed. The crucial point was the effect to be given to a "no recourse" provision in a contract of sale. That case is inapposite here.

use and development, and other relevant economic factors, including comparable sales. Although petitioner's experts testified only as to the fair market value of the tracts on the crucial dates, and respondent's expert framed his valuation in terms of an allocation of cost basis, the differences do not diminish the weight to be given to either party's evidence. The relative fair market value of each tract, shown by petitioner's experts, is easily convertible into the proportion of the cost basis allocable to each tract.

After considering all the evidence, including the expert testimony,[6] we have found that, of the total $130,000 cost basis, $96,800 is allocable to the 148-acre lower tract, and $33,200 is allocable to the 120-acre upper tract.

*Decision will be entered under Rule 50.*

---

[6] Although petitioner in his 1963 return allocated $124,000 to the lower tract, leaving only $6,000 for the upper tract, he does not seriously defend that allocation in this proceeding. He offered the testimony of two experts concerning the fair market values of the two tracts. One expert's testimony, when converted to a proportion of the cost basis, allocated $105,300 to the lower tract, disregarding a house and well located thereon, and $24,700 to the upper tract. Petitioner's other expert furnished a value which, when converted, represented an allocation, of $98,800 to the lower tract, disregarding the house and well, and $31,200 to the upper tract. Respondent's expert allocated approximately $88,000 to the lower tract, including the value attributable to the house and well, and $42,000 to the upper tract. In weighing this expert testimony, we have made adjustments due to these inconsistencies in the treatment of the house and well by the different experts.