KEITH HARPER and WINNIE HARPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harper v. Commissioner
Docket No. 712-73.
United States Tax Court
T.C. Memo 1976-58; 1976 Tax Ct. Memo LEXIS 344; 35 T.C.M. (CCH) 256; T.C.M. (RIA) 760058; March 3, 1976, Filed Allan Sherry, for the petitioners. Andrew M. Winkler, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' Federal income taxes of $8,760.30 for 1969 and $4,264.54 for 1970. The issues are: (1) Whether the sale of certain real property by petitioners resulted in ordinary income, short-term capital gain, or long-term capital gain; (2) whether petitioners are entitled to business bad debt deductions in excess of those allowed by respondent; (3) whether certain expenditures *346 for insulation of a business building and for conversion of one room in that building constitute capital expenditures; and (4) whether petitioners are entitled to deductions for vehicle expenses incurred in connection with a trade or business in excess of those allowed by respondent. FINDINGS OF FACT Keith Harper (hereinafter petitioner) and Winnie Harper, husband and wife, resided in Beallsville, Ohio, at all times material herein. They filed joint Federal income tax returns for 1969 and 1970 with the District Director of Internal Revenue, Cleveland, Ohio. Petitioner owned and operated two funeral homes and a furniture store during 1969 and 1970. Issue 1: Sale of Real Property
Prior to 1969, petitioner and some other individuals owned some twenty-five houses through a corporation named Swiss Rentals. These houses had been built to provide housing for employees of a plant being built by Olin-Mathison Corporation by a nearby river. Swiss Rentals built these houses, and petitioner individually had maintained these houses for ten or twelve years. Petitioner and five or six other individuals also bought real property in that area which later became the Switzerland of Ohio *347 Country Club. Petitioner and several other individuals also owned a corporation called D & K Rentals which had as its only asset a gasoline station. Petitioner bought the other individuals' interests and accordingly became the sole corporate shareholder. Petitioner never operated the gasoline station, however, and he was still holding it as an inactive asset in 1974. In 1968, the Wheeling Dollar Savings and Trust Company, of Wheeling, West Virginia, through its president, Robert C. Hazlet, listed eight houses (sometimes hereinafter "eight houses") for sale with Harvey Goodman, a real estate broker in St. Clairsville, Ohio. The eight houses were located in Wilson, Ohio, and were among the twenty-five houses earlier built and maintained by petitioner through Swiss Rentals. The eight houses were being offered for sale on an individual basis with asking prices ranging from approximately $9,000 to $14,000. On March 17, 1969, petitioner asked Hilda Truax, a real estate agent associated with Harvey Goodman, to submit his oral offer to purchase all eight houses for $40,000, along with a $100 deposit to the owner of the properties. On April 17, 1969, petitioner submitted a written offer *348 through Hilda Truax to the Wheeling Dollar Savings and Trust Company to purchase the eight houses for $40,000. The $100 deposit was submitted with the offer. The offer provided that (1) its provisions were to constitute the sole agreement of the parties; (2) the offer would become binding upon acceptance by the Wheeling Dollar Savings and Trust Company; (3) taxes and assessments, prepaid insurance premiums, interest and rents, if any, were to be prorated as of the date of deed delivery; and (4) the offer was open for acceptance within ten days from April 17, 1969. On April 21, 1969, the Wheeling Dollar Savings and Trust Company submitted its written acceptance of the offer, signed by its president, to petitioner through Hilda Truax. The Wheeling Dollar Savings and Trust Company sent a letter to Hilda Truax, along with the deed, executed by its president on May 8, 1969, conveying its title to the eight houses to petitioner. On May 23, 1969, the closing with respect to sale of the eight houses to petitioner took place. Petitioner executed deeds conveying title to these eight frame houses to the following individuals, on the following dates and for the following gross sales prices: *349 Date
Purchaser
Gross Sales Price
May 22, 1969
Edwin Perkins
$ 8,000.00
May 22, 1969
Harold J. Bilyew
9,000.00
May 22, 1969
Robert Wahl
7,200.00
May 22, 1969
Robert Frasher
9,000.00
Aug. 20, 1969
Ronald Harmon
8,500.00
Aug. 20, 1969
Richard Graham
8,000.00
Aug. 27, 1969
Sideney Saufley
9,000.00
Sept. 29, 1969
Gary Jackson
8,700.00
$67,400.00
Petitioner's basis in these eight houses for tax purposes was $43,750; his gain on their sale was $23,650. Petitioner repaired some of the houses before selling them. Petitioner realized gains from the sale of real property during 1969 and 1970 in the following additional amounts: Property
Date Acquired
Date Sold
Gain
House
Aug. 23, 1969
Sept. 29, 1969
$1,500.00
House
Nov. 21, 1969
Dec. 13, 1969
1,800.00
House
Nov. 21, 1969
Jan. 23, 1970
1,600.00
House
Dec. 17, 1969
Mar. 18, 1970
2,500.00
House
April, 1970
April, 1970
1,000.00
House
April, 1970
April, 1970
1,000.00
Land
April, 1970
April, 1970
500.00
Petitioner reported a $25,150 long-term capital gain on his 1969 Federal income tax return from sale of nine houses and accordingly included *350 half of that amount, or $12,575, in income. Respondent determined that petitioner realized a gain of $26,950 in 1969 from sale of ten houses and that all of such gain constituted ordinary income. Petitioner reported a short-term capital gain of $2,500 on his 1970 Federal income tax return from the sale of two residences and a piece of land in April and included that amount in income. Petitioner also reported a $5,900 long-term capital gain from the sale of three houses in 1970 and accordingly included half of that amount, or $2,950, in income. Respondent determined that petitioner realized a gain of $6,600 in 1970 from the sale of four houses and a piece of land, which constituted ordinary income. Issue 2: Business Bad Debt Deductions
Petitioner claimed business bad debt deductions on Schedule C of his 1969 and 1970 Federal income tax returns in the respective amounts of $6,413.00 and $2,771.64, of which respondent allowed $2,408.00 and $527.78, respectively. From April of 1968 through the years in issue herein, petitioner's business books and records were exclusively maintained by Betty Giesey, his secretary, who was also in charge of all billing and collection efforts *351 for petitioner's business accounts for that time. Petitioner's practice with respect to business bad debt deductions was to claim deductions for those uncollected accounts that petitioner thought were unlikely to be paid. It was his practice to leave accounts on his books and records that had already been claimed on his tax returns as bad debts and to have his secretary continue to make collection efforts on those accounts for up to five or six years. On occasion, petitioner turned over uncollected accounts to collection agencies and sometimes had suits instituted against individuals responsible for such debts; none of petitioner's uncollected business accounts, however, were written off his books. The specific debts for which petitioner claimed business bad debt deductions in 1969 and 1970 are not identifiable from the business records and tax returns submitted at trial, and at the time of trial petitioner had no knowledge of which debts had been claimed as worthless on those returns. An affidavit of petitioner dated May 26, 1972, lists debts in excess of those claimed on petitioner's 1969 and 1970 Federal income tax returns, but the affidavit does not indicate whether any or which *352 of such debts were claimed on his income tax returns. At the time of trial, petitioner did not know who prepared the list contained in the affidavit and did not know whether the accounts listed on the affidavit actually had been claimed as bad debts on his tax returns. Issue 3: Funeral Home Expenditures
Petitioner's cost, or other basis, for his Beallsville, Ohio, funeral home in 1958 was $7,500. During 1969, petitioner had that home insulated. The insulation was put throughout the structure, under the roof and into the walls. Petitioner deducted $2,929.13 for "Insulating" on Schedule C of his 1969 Federal income tax return. Respondent allowed in lieu thereof a depreciation deduction of $118.50 in both 1969 and 1970. Respondent determined that the actual cost of insulating the funeral home was $2,370, that this cost represented a capital expenditure depreciable over a twenty-year useful life under the straight-line method of computing depreciation, and that the $559.13 balance of the claimed deduction represented interest that was not paid or accrued within the taxable year 1969. Petitioner submitted no documentary evidence as to the actual cost of insulating the funeral *353 home and submitted no evidence at all as to how much interest expense was attributable to that insulation or as to what year such interest was paid or accrued. During 1970, petitioner incurred construction and remodeling expenses in turning the kitchen area of his Beallsville, Ohio, funeral home into an office and powder room. Petitioner deducted $2,981.71 for the cost of this construction and remodeling on Schedule C of his 1970 Federal income tax return. Respondent allowed in lieu thereof a building repairs deduction of $180.44 and a depreciation deduction of $140.06; respondent determined that the balance of the claimed deduction was a capital expenditure, depreciable over a twenty-year useful life under the straight-line method of computing depreciation. Issue 4: Vehicle Expenses
Petitioner used two ambulances, a Ford station wagon, a 1968 Chevrolet, and a 1970 Dodge station wagon in his businesses during 1969 and 1970. Petitioner claimed depreciation deductions for these vehicles on Schedule C on his 1969 and 1970 Federal income tax returns; respondent allowed these deductions in part. Respondent allowed in full claimed business expense deductions for these vehicles *354 on those returns for license tags. Petitioner also claimed deductions for "[auto] [expenses]" on those respective returns of $5,000 and $5,490. Respondent determined that petitioner was not entitled to compute deductions claimed for such expenses for 1969 and 1970 on the "standard mileage rate basis." Respondent accordingly allowed, in lieu of the deductions claimed, deductions for actual expenses for gasoline, oil and maintenance for 1969 and 1970 in the respective amounts of $1,583.89 and $2,063.06. Petitioner submitted no receipts or records of actual automobile expenses for gasoline, oil, and maintenance for 1969 and 1970. Petitioner presented no evidence, other than his oral estimates, as to business usage, including mileage, of any of the vehicles used in his businesses during 1969 and 1970. OPINION Issue 1: Sale of Real Property
The first issue is whether gain realized from the sale of certain houses and real property by petitioner constituted ordinary income, short-term capital gain, or long-term capital gain. Petitioner contends that all the sales resulted in long-term capital gain, except for three purchases and sales during the same month, which he contends *355 resulted in short-term capital gain. Respondent contends that petitioner held the properties for sale in the ordinary course of business and that accordingly any gain realized constituted ordinary income. In the alternative, respondent contends that all purchases and sales occurred in less than six months for each respective property and that accordingly only short-term capital gain was realized. Section 1202[1] provides a deduction for a taxpayer other than a corporation of 50 percent of the amount of excess of net long-term capital gain over not short-term capital loss. Section 1222(3) defines "long-term capital gain" as "gain from the sale or exchange of a capital asset held for more than 6 months." Section 1221(1) excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." *356 As used in section 1221(1), "primarily" means "of first importance" or "principally." Malat v. Riddell,383 U.S. 569, 572 (1966). Although many factors have been considered by the courts in determining whether a particular piece of property is a capital asset or inventory, no single element is conclusive and each case must rest upon its own facts. Scheuber v. Commissioner,371 F. 2d 996, 998 (7th Cir. 1967). Of course, capital gains provisions, since they are exceptions to normal tax requirements, are to be narrowly construed. Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955). "[The] fundamental objective of the capital gain provisions of the Code * * * is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income * * *." Raymond Bauschard,31 T.C. 910, 916 (1959), affd. 279 F. 2d 115 (6th Cir. 1960). The burden of proof is on petitioner to establish that the property sold was not held by him primarily for sale *357 to customers in the ordinary course of a trade or business. S. O. Bynum,46 T.C. 295, 298 (1966). After considering all evidence presented, we believe that petitioner has not rebutted respondent's determination that the properties in issue were held primarily for sale to customers in the ordinary course of business. Petitioner has been engaged in buying and selling real estate since well before 1969. He and other individuals, through a corporation called Swiss Rentals, originally built some twenty-five houses, among which were the eight houses petitioner later repurchased and resold. Petitioner was also involved in the purchase and sale of land on which the Switzerland of Ohio Country Club was later built. Petitioner was also involved in D & K rentals, a corporation which owned a gasoline station. This pattern of engaging in real estate transactions continued in 1969 and 1970. Including the eight houses which petitioner purchased on May 23, 1969, petitioner bought and sold fifteen pieces of real estate during those years. He did not hold any such properties for more than a limited number of months before he sold them, and he realized a gain on each sale. Some *358 of the properties were only held a day or a few weeks before their resale. We believe that it was clearly petitioner's intent to buy, sometimes repair, and resell the houses for a quick profit, rather than to hold them for gain through general advances in the real estate market over a substantial period of time. We note also that petitioner's income from these real estate transactions constituted over half of his income for both years in issue. Petitioner testified that he did not know why he had decided to sell the eight houses. On such a record, we have no choice but to sustain respondent's determination. We accordingly find that petitioner's gain was not of the type contemplated by the statute and that his profits from all the 1969 and 1970 property sales constituted ordinary income to him because he was in the trade or business of buying and reselling such properties. Furthermore, petitioner submitted no credible evidence to rebut respondent's determination that these properties were not held for more than six months each. The burden and benefits of ownership did not begin to run with respect to petitioner's acquisition of the eight houses until May 23, 1969, the closing *359 date for that sale. Vernon Hoven,56 T.C. 50 (1971). Accordingly, even if petitioner had not been in the trade or business of buying and selling such properties, all this gain would constitute short-term capital gain and would, in effect, be treated the same as ordinary income on petitioner's income tax returns, as petitioner had no capital losses with which to offset such gains. Petitioner's contention that he had to recover his basis in the eight houses, which he acquired in a single purchase, on an aggregate basis before any moneys received could constitute gain to him is without merit, section 1.61-6(a), Income Tax Regs., [2] as are petitioner's other contentions on this issue. *360 Issue 2: Business Bad Debt Deductions
The second issue is whether petitioner is entitled to business bad debt deductions in excess of those allowed by respondent for 1969 and 1970. Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year." The question of whether a debt actually becomes worthless during a taxable year is to be determined on the basis of all surrounding facts and circumstances, the burden of proof being upon petitioner. Henry C. Mueller,60 T.C. 36, 41 (1973), affd. on this issue, 496 F. 2d 899 (5th Cir. 1974). Furthermore, as we stated in Herbert W. Dustin,53 T.C. 491, 501-502 (1969), affd. 467 F. 2d 47 (9th Cir. 1972): In order to satisfy their burden of proof, the petitioners must show that the debt had some value at the end of [the proceeding year] and that it had become worthless by the end of [the current taxable year]. This means a lack of potential value as well as current liquid value. Worthlessness must be determined by objective standards; generally *361 this burden is met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value, although such is not indispensable. [Citations omitted] The unsupported opinion of the taxpayer alone that the debt is worthless will not usually be accepted as proof of worthlessness. Petitioner did not submit any satisfactory evidence from which it could be determined whether any debt qualified for deduction in 1969 or 1970. He admitted at trial that he had no knowledge of which debts had been claimed as worthless on his 1969 or 1970 Federal income tax returns. Furthermore, petitioner admitted that he did not know what collection actions had been taken with respect to any of the debts due him. Petitioner accordingly could not furnish a factual basis, even if we were so inclined, to determine when particular debts might have become worthless. All petitioner did offer was his own unsupported opinion as to when a particular debt became worthless. On the basis of the woefully inadequate evidence presented, respondent's determination that business bad debt deductions should not be allowed in excess of those already allowed *362 for 1969 and 1970 must be sustained. Issue 3: Funeral Home Expenditures
The third issue is whether petitioner's expenditures for insulation of his Beallsville, Ohio, funeral home and for conversion of the kitchen of that home into an office and powder room constituted capital expenditures or deductible business expenses. Section 263(a) provides, in part, as follows: SEC. 263. CAPITAL EXPENDITURES. (a) General Rule.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allow- Section 1.263(a)-1(b), Income Tax Regs., accordingly states that capital expenditures include "amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) *363 to adapt property to a new or different use." It is clear that the insulation substantially added to the value of the funeral home. We accordingly hold that respondent's determination that the cost of such insulation must be capitalized and then depreciated should be sustained; petitioner's contention that the amount claimed for insulation in fact was expended for repairs finds no corroborative support in the record. Since petitioner has presented no evidence to the contrary, we also sustain respondent's determination that (1) the cost of insulating the funeral home was $2,370.00; (2) the balance of the deduction claimed by petitioner, $559.13, was not deductible in 1969 because it represented interest that was not paid or incurred in that year; and (3) the cost of insulating the funeral home was depreciable over a twenty-year useful life under the straight-line method of computing depreciation. As to $2,981.71 deducted by petitioner in 1970 for conversion of the funeral home kitchen to an office and powder room, such amount clearly constituted an amount paid or incurred "to adapt property to a new or different use" within the meaning of section 1.263(a)-1(b), Income Tax Regs. *364 Respondent allowed $118.14 of the amount claimed as repairs, and petitioner has presented no proof on this issue to the contrary; accordingly, the remaining balance of the amount claimed, $2,801.27, constitutes a capital expenditure and must be depreciated in accordance with respondent's determination. Petitioner again presented no evidence to contradict respondent's determination that these capital improvements were depreciable over a twenty-year useful life under the straight-line method of computing depreciation, and respondent's determination in this regard is also sustained. Issue 4. Vehicle Expenses.
The last issue is whether petitioner is entitled to deductions for business vehicle expenses in excess of those allowed by respondent. Section 162(a) provides a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." That section does not permit deduction of any amount greater than an individual's actual cost of business operation of his automobile. Ralph E. Schumaker,T.C. Memo. 1970-281 (1970), *365 affd. 451 F. 2d 1349 (6th Cir. 1971). In Rev. Proc. 66-10, 1966-1 C.B. 622, in effect for the taxable year 1969, and in Rev. Proc. 70-25, 1970-2 C.B. 506, effective for the taxable year 1970, respondent authorized an optional, simplified method of computing deductible costs of operating passenger automobiles, including vehicles such as pickup or panel trucks. To utilize the standard mileage rates provided therein, a self-employed individual or employee is required to establish business mileage for local transportation in accordance with section 1.162-17(d), Income Tax Regs., and for other travel in accordance with section 1.274-5, Income Tax Regs.
Since petitioner failed to present any proof on this issue except for his own oral estimates at trial as to the mileage he drove, he clearly has not satisfied the mileage substantiation requirements required by the regulations in order to compute his vehicle expenses at the standard mileage rates provided in the cited revenue procedures. Furthermore, since no proof was presented which would support a finding that petitioner was entitled to *366 deduct actual vehicle expenses in excess of those allowed by respondent, petitioner is not entitled to any deductions in excess of the amounts so allowed. We accordingly hold for respondent on this issue. No proof was submitted at trial with respect to interest deductions which were apparently in issue at the time of the stipulation; and in light of petitioner's additional failure to brief such issue, respondent's determination on that point is accordingly sustained. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954.↩
2. That regulation provides in part as follows: When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.↩