WILLIAM THORNTON AND BARBARA THORNTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thornton v. Commissioner
Docket No. 38315-87.
United States Tax Court
T.C. Memo 1989-214; 1989 Tax Ct. Memo LEXIS 214; 57 T.C.M. (CCH) 320; T.C.M. (RIA) 89214; May 4, 1989; As Corrected May 4, 1989 Roland K. Martin, Jr., for the petitioners. Karen Quesnel, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax for their 1981 and 1982 taxable years in the amounts of $ 35,495 and $ 82,205, respectively. The parties having reached agreement with respect to all other issues raised, the sole issue for decision is whether section 170(e)(1)(A)[1] limits the amount of petitioners' charitable contribution deduction to petitioners' adjusted basis in their interest in a library contributed to a law school on December 31, 1982. We find that petitioners acquired their interest in the library at some point in time after December 30, 1981, and contributed this interest to a law school on December 31, 1982. *216 We hold that the charitable contribution allowed petitioners is limited by section 170(e)(1)(A) to the amount of petitioners' adjusted basis in the property contributed. FINDINGS OF FACT Some of the facts have been stipulated. The stipulated facts and the exhibits attached thereto are incorporated herein by reference. Petitioners, William Thornton and Barbara Thornton, resided in Reno, Nevada, at the time the petition in this case was filed. On June 5, 1981, the Potomac School of Law (the Bankrupt), located in Washington, D.C., filed a petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court (Bankruptcy Court). Appointed by the Bankruptcy Court to act as trustee of the Bankrupt's estate was Nelson Decklebaum (Decklebaum), an attorney who had approximately 25 years experience in acting as a trustee in bankruptcy or as an attorney to such trustees. Decklebaum's primary function was to liquidate the Bankrupt's estate for the benefit of its creditors. The Bankrupt's principal asset was its law library (the Library), which consisted of books, shelving, and peripheral library equipment. During the last half of 1981, Decklebaum advertised the *217 Library for sale. During the later part of 1981, Decklebaum was made an offer for the purchase of the Library by Warren Nelson (Nelson), in his capacity as head of a group of investors (the Purchasers), which group included petitioner-Mr. Thornton. After negotiations between Nelson and Decklebaum, it was agreed that the Library would be sold to the Purchasers for $ 250,000 cash. On December 30, 1981, the Purchasers wire-transferred $ 250,000 to Decklebaum for the purchase of the Library. Decklebaum deposited the $ 250,000 in a certificate of deposit in his name as trustee of the Bankrupt. Petitioners contributed $ 25,000 of the purchase price in exchange for a 10 percent interest in the Library. Other than the Purchasers' receipt for the wire transfer to Decklebaum, no writing or combination of writings exists to reflect the agreement of Decklebaum and the Purchasers regarding the sale and purchase of the Library. The interest from the certificate of deposit accrued to the benefit of the Bankrupt. However, the principal of such certificate and the interest accrued thereon would have been returned to the Purchasers if, prior to approval of the sale by the Bankruptcy Court, *218 the Library had been destroyed by casualty. Such monies would also have been returned to the Purchasers had an offer in excess of the Purchasers' offer been made to, and accepted by, Decklebaum prior to approval of the sale by the Bankruptcy Court. Further, despite having received payment of the purchase price from the Purchasers, Decklebaum would not have released the Library into the Purchasers' possession, prior to receipt of the Bankruptcy Court's approval, unless the Purchasers first agreed that the Library would be returned to the Bankrupt if such Court's approval was ultimately not given. Because the Bankrupt was under the jurisdiction of the Bankruptcy Court, Decklebaum was required by bankruptcy law [2] to give notice to the Bankrupt's secured creditors of his intent to sell the Library. Such notice was given by Decklebaum, to the attorneys of the secured creditors and to the Bankruptcy Court, on February 2 and February 3, 1982, respectively. On February 18, 1982, Ellen Batzel Behravesh, an unsecured creditor of the Bankrupt, *219 filed with the Bankruptcy Court an objection to the proposed sale of the Library. The Bankruptcy Court held a hearing on such objection on March 17, 1982. At such hearing, the Bankruptcy Court also considered certain other issues raised concerning the disbursement of the proceeds of the proposed sale. On March 31, 1982, the Bankruptcy Court approved the proposed sale of the Library and ordered Decklebaum to issue a bill of sale to the Purchasers and to disburse the proceeds of the sale amongst the Bankrupt's creditors. The Purchasers ultimately took physical possession of the Library during the summer of 1982. From December 30, 1981, until summer 1982, the Library was warehoused with the Northern Virginia Van Company (the Van Company) in Tyson's Corner, Virginia. On April 15, 1982, the Van Company filed with the Bankruptcy Court a proof of claim for storage fees with respect to the Library for the period from January 10 through April 10, 1982. Thereafter, several of the Bankrupt's creditors, including the Van Company, filed motions with the Bankruptcy Court for an order compelling Decklebaum to release the proceeds from the sale of the Library as he had previously been ordered *220 to do by that court. On May 27, 1982, the Bankruptcy Court held a hearing with respect to the various motions filed for the disbursement of the proceeds from the Library's sale. In response to such motions, on June 4, 1982, the Bankruptcy Court again ordered Decklebaum to disburse amongst the creditors the monies received from the Purchasers, and to issue to the Purchasers a bill of sale for the Library. The Bankruptcy Court also ordered the Purchasers to assume or resolve any expenses arising after March 31, 1982, with respect to the Van Company's storage or removal of the Library. When Nelson arranged for the purchase of the Library, the Purchasers intended to obtain the Library for the purpose of donating it to a law school in the State of Nevada. The Purchasers' intent was effected on December 31, 1982, when the Library was donated to the Old College School of Law, an organization which was, at that time, described in section 170(c). On their 1982 joint Federal income tax return, petitioners claimed a charitable contribution deduction in the amount of $ 101,195 for their donation of a 10 percent interest in the Library to Old College School of Law. Such deduction was calculated *221 based on the Purchasers asserted date of contribution fair market value for the Library of $ 1,011,950. Pursuant to the parties' agreement, the Library actually had a fair market value of $ 870,000 on the date of such contribution. OPINION The issue is whether section 170(e)(1)(A) operates to limit the amount of petitioners' charitable contribution deduction to the amount of petitioners' adjusted basis in their interest in the Library on the date of contribution. Generally, a taxpayer is entitled to a deduction for any charitable contribution made within the taxable year to an organization described in section 170(c). Sec. 170(a). Generally, if the contribution consists of property other than money, however, the amount which is allowed as a deduction is the fair market value of the property contributed on the date of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Such fair market value amount is reduced, however, by "the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its *222 fair market value (determined at the time of such contribution) * * *." Sec. 170(e)(1)(A). During 1982, the year in which the contribution in question was made, the holding period for long-term capital gain property was one year. Sec. 1222(3). The parties' only disagreement with respect to petitioners' claimed charitable contribution deduction concerns whether petitioners held their interest in the Library for more than one year prior to its contribution. Petitioners assert that they acquired their interest in the Library on December 30, 1981, and held the property for more than one year as of December 31, 1982, when they made the contribution in question. Accordingly, petitioners contend, section 170(e)(1)(A) does not act to limit the amount of petitioners' allowable charitable contribution deduction. Respondent asserts that petitioners did not hold their interest in the Library for one year. Respondent's position is that, as of December 30, 1981, and through until March 31, 1982, petitioners could not have acquired their interest in the Library because, pursuant to Federal Bankruptcy law, Decklebaum did not have the authority to sell the Library to petitioners as he had not *223 yet obtained approval for the sale from the Bankruptcy Court. Therefore, respondent argues, petitioners' deduction is limited by section 170(e)(1)(A) to the amount of their adjusted basis in their interest in the Library. The duration of petitioners' holding period with respect to their interest in the Library depends upon the date of petitioners' acquisition of such interest. See McFeeley v. Commissioner,296 U.S. 102, 107 (1935). "In determining the date of acquisition of the ownership of property, no hard-and-fast rules of thumb can be used, and no single factor is controlling." Hoven v. Commissioner,56 T.C. 50, 55 (1971). We must instead look at all of the facts and circumstances surrounding the acquisition transaction. Clodfelter v. Commissioner,426 F.2d 1391, 1393 (9th Cir. 1970). Consideration must also be given to the date on which the benefits and burdens or the incidents of ownership of the property passed to the buyer. Hoven v. Commissioner, supra at 55; Merrill v. Commissioner,40 T.C. 66, 74 (1963), *224 affd. 336 F.2d 771 (9th Cir. 1964). In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981), we summarized some of the indications of ownership as follows: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. (Citations omitted). [3]
With *225 these factors in mind, we find that the incidents of ownership to their interest in the Library did not pass to petitioners until some point in time after December 30, 1981. We first look to when petitioners acquired title to their interest in the Library. Decklebaum was totally without authority to pass title to the Library to the Purchasers without approval of the sale by the Bankruptcy Court. Further, the Bankruptcy Court did not approve the sale and order that a bill of sale be issued to the Purchasers until March 31, 1982. From this, we find that title to their interest in the Library did not pass to petitioners until some time after December 30, 1981. The way the Purchasers and Decklebaum treated the purported December 30, 1981, sale likewise indicates that the sale did not occur until some point in time after that date. All parties to the transaction understood that the sale could not be completed unless and until it was approved by the Bankruptcy Court. Decklebaum knew that, without Bankruptcy Court approval, he was without authority to sell the Library. Accordingly, Decklebaum would not have released the Library into the Purchasers' possession, despite his having *226 received full payment of the purchase price, unless the Purchasers agreed to return the Library to the Bankrupt if the Bankruptcy Court did not approve the sale. Further, the Bankruptcy Court must be considered to be a party to the sale of the Library because of its dominion over the Bankrupt. As a party to the sale, the Bankruptcy Court also did not treat the purported December 30, 1981, sale as a completed transaction, since it did not order a bill of sale to be issued to the Purchasers until March 31, 1982, after after it had entertained all objections made to the proposed sale by the Bankrupt's creditors. Such treatment indicates a post-December 30, 1981, date of acquisition by petitioners. With respect to whether the Purchasers acquired any equity in the Library on December 30, 1981, we find that they did not. Deckelbaum was free to reject the Purchasers' offer of $ 250,000 for the purchase of the Library, and accept any other, more favorable offer, at any time prior to approval of the sale to the Purchasers by the Bankruptcy Court. This being the case, petitioners did not, as of December 30, 1981, acquire any equity in anything other than the certificate of deposit *227 purchased by Deckelbaum with the money paid him by the Purchasers. It is also clear that no contract existed between Deckelbaum and the Purchasers which created, as of December 30, 1981, an obligation for the Bankrupt to execute and deliver a deed and an obligation for the Purchasers to make payment of the purchase price. Although the purchase price was fully paid, the Purchasers could not have demanded of Deckelbaum the execution of a bill of sale to the Library. The Bankruptcy Court had complete dominion over the Bankrupt as of December 30, 1981. Until such Court approved the sale, no one could have obliged Deckelbaum to deliver a deed to the Library. Accordingly, petitioners cannot be said to have had such right. With respect to the right of possession, the Purchasers had no authority to require that the Library be delivered to them on December 30, 1981. The Purchasers continued without such authority until the Bankruptcy Court ordered, on March 31, 1982, that Decklebaum issue a bill of sale to the Purchasers. Although no property taxes were paid with respect to the Library, storage fees did accrue against the Library at the Van Company. Such expenses were allocated by *228 the Bankruptcy Court so that the Purchasers were obligated to pay any storage expenses accruing after March 31, 1982. This indicates that the Purchasers did not assume the burdens of ownership of the Library until after December 30, 1981. The risk of loss or damage to the Library was also not born by the Purchasers until after March 31, 1982. Had the Library been damaged prior to Bankruptcy Court approval of the sale, Decklebaum would have returned to the Purchasers the full purchase price paid, plus interest. Finally, had another buyer offered to purchase the Library prior to the Bankruptcy Court's approval of the sale, at a higher price than that paid by the Purchasers, Decklebaum would have accepted such other offer and returned the Purchasers' payment, plus interest. Accordingly, it is clear that until the Bankruptcy Court approved the sale to the Purchasers the Bankrupt continued to retain the right to receive any benefits from the disposition of the Library. The facts and circumstances reflect that petitioners did not acquire their interest in the Library until after December 30, 1981. Accordingly, with respect to their contribution of such interest on December 31, 1982, their *229 allowable deduction is the fair market value of their interest in the Library on the date of contribution, reduced as provided by section 170(e)(1)(A). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. 11 U.S.C. section 363↩.
3. We recognize that Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221↩ (1981), was a tax shelter case and utilized these factors to determine whether ownership passed from a seller to a buyer. However, we believe that inherent in the question of whether title passed is the question of when title passed. Accordingly, we find these factors to also be probative for our present purposes.