Billy H. SANDERS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 80–377–N.

United States District Court, M.D. Alabama, N.D.

Feb. 22, 1983.

Jo Karen Parr and Charles B. Paterson, Ball, Ball, Duke & Matthews, Montgomery, Ala., for plaintiff.

John C. Bell, U.S. Atty., and Kenneth E. Vines, Asst. U.S. Atty., M.D. Ala., Montgomery, Ala., and Karl L. Kellar, Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## OPINION

MYRON H. THOMPSON, District Judge.

This cause of action, in which the plaintiff Billy H. Sanders seeks recovery of income taxes allegedly wrongfully collected by the defendant United States of America, is now before the court on motions for summary judgment filed by both Sanders and the United States.[1] Upon consideration of the motions and the evidence and briefs submitted in connection therewith, the court is of the opinion for the following reasons that the motion for summary judgment filed by the United States is due to be granted and that the motion for summary judgment filed by Sanders is due to be denied.

### I. The Facts

The relevant facts are not in dispute.

In 1950, Sanders and his sister purchased several hundred acres of farm land, located in Elmore County, Alabama, which over the years had been leased to their father on a sharecropper basis and on which they had lived as children. They purchased the farm land because the owner of the land had recently died and they were concerned that their parents would have to move. Between 1950 and 1955, Sanders and his sister sold 80 acres of the land to an adjoining property owner, and later Sanders purchased his sister's share of the property. Also, Sanders's father continued to farm the land until the mid-60's when his father suffered a stroke and was no longer physically able to farm the land. Sanders then tried, unsuccessfully, to sell an additional 80 acres, mostly swamp land, to the same adjoining property owner. Sanders never farmed the land himself. Instead, he operated an automobile sales business from 1950 until 1966 or 1967, when, because both the business and his health were failing, he sold the business.

In 1967, in an effort "to figure out something else to get into," Sanders decided to subdivide some of the farm property. Therefore, between 1967 and 1975, he had 54 acres of the land subdivided, at a cost of approximately $3,500.00, into a 98-lot subdivision which he named Paige Hills Estates; he had water facilities and paved streets put in the subdivision at a cost of approximately $54,911.89; he had power and gas lines put in at apparently no cost; he arranged to have the lots approved for Veterans Administration and Farmers Home Administration financing; and he constructed houses on eleven of the lots. Initially, Sanders engaged in only limited advertising and the subdivision project was not as successful as Sanders had anticipated, with only eight lots sold in 1968 and two in 1969. He, therefore, reacquired his automobile sales business in 1969. The poor lot sales continued into 1970, with no sales. However, in 1971, the subdivision business picked up and in 1972 Sanders sold the automobile sales business, which was again failing. Between 1971 and 1976, Sanders sold 87 lots, nine of which had houses on them, as follows:

| YEARS | LOTS SOLD | WITH HOUSES |
| --- | --- | --- |
| 1971 | 17 | 0 |
| 1972 | 13 | 0 |
| 1973 | 18 | 0 |
| 1974 | 17 | 2 |
| 1975 | 21 | 6 |
| 1976 | 1 | 1 |

These lots were sold under varying arrangements. Sales of lots without houses were made to builders either directly by Sanders or by brokers working on behalf of Sanders without a brokerage commission or fee, but with the understanding that the brokers would be allowed to resell the lots for the builders once houses had been constructed on the lots. Sales of lots with houses were made by brokers working on Sanders's be-

---

1. This court's jurisdiction is properly invoked pursuant to 28 U.S.C.A. § 1346(a)(1).

half with the brokers receiving a four percent commission for their efforts. Sanders engaged in limited sales advertising for those lots without houses and the brokers engaged in substantial sales advertising for those lots with houses. In 1974 and 1975, between 70 and 80% of Sanders's income came from sales in Paige Hills Estates.[2]

After selling all but one of the lots in Paige Hills Subdivision, Sanders developed another subdivision, called Crossgate, in the same manner on another part of the farm property.

For the calendar years 1974 and 1975, Sanders filed income tax returns in which he claimed that profits derived from sale of lots without houses in Paige Hills Estates were "capital gains" rather than "ordinary income."[3] In 1977, the United States Internal Revenue Service disallowed the capital gains treatment and assessed additional income taxes against Sanders, which additional taxes Sanders then paid. In 1979, Sanders filed amended income tax returns for the calendar years 1974 and 1975 and in the amended returns requested a refund of the additional taxes assessed in 1977. In the amended return for 1974 he stated:

> Taxpayer paid additional income tax in the amount of $10,241.30 on December 22, 1977 attributable to the disallowance of the deduction for capital gains provided for by Section 1202 of the Internal Revenue Code of 1954, as amended. (Code). The taxpayer reported gain from the sale of lots in the amount of $42,359.14 on property which taxpayer owned as a farm since 1951. The sale of lots were in an orderly liquidation of a portion of the farm and were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The gain is thus a long term capital gain and the deduction equal to 50% of the gain is allowable under the provisions of Section 1202 of the Code. *L.J. Barrios* [*v. C.I.R.*] (5th Cir.) 265 F.2d 517.

In the alternate taxpayer is entitled to treat the gain as a long term capital gain in accordance with Section 1237 of the Code. Such property had been held by taxpayer for over 10 years.

Except for the amounts involved, Sanders made an almost identical statement in the amended return filed for 1975. In 1980, the Internal Revenue Service rejected Sanders's claim for refund of the additional taxes assessed for both 1974 and 1975. Sanders then timely filed this action pursuant to 26 U.S.C.A. § 7422.

## II.   The Law

Sanders makes two contentions in support of his claim that profits from the sale of lots without houses in 1974 and 1975 are entitled to capital gains treatment. He contends, first, that profits from the sale of the lots involved are entitled to capital gains treatment pursuant to the general provisions of 26 U.S.C.A. § 1221; and he contends, second, that even if the profits are not entitled to capital gains treatment under the general provisions of section 1221, the profits are entitled to such treatment under the special provisions of 26 U.S.C.A. § 1237 regarding the sale of subdivided real property. As would be expected, the United States maintains that both contentions are without merit.

### A.   Section 1221

Before the substantive merit or lack thereof in the section 1221 contention advanced by Sanders may be addressed, the court must first consider, based on the evidence, whether the contention may be appropriately resolved on cross-motions for summary judgment. On a motion for summary judgment, the movant has the burden of establishing that there are no genuine disputes as to any material fact and that the movant is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. In the instant case the underlying facts as set forth above are un-

---

2. Sanders's other sources of income included interest from his savings accounts, proceeds from leasing the land for mining of sand and gravel, and proceeds from hay sales.

3. Sanders did not claim, and is not claiming in this lawsuit, that profits derived from those lots with houses are entitled to capital gains treatment.

disputed. The only issue to be resolved at this time is whether, based upon the undisputed facts, the profits derived by Sanders from the sale of lots without houses are entitled, under section 1221, to capital gains or ordinary income treatment. This ultimate issue, which involves the weighing of various factors described later, is a legal, not factual one, *Houston Endowment, Inc. v. United States,* 606 F.2d 77, 83 (5th Cir. 1979); *Biedenharn Realty Co. v. United States,* 526 F.2d 409, 416 & n. 25 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), and is therefore resolvable on cross-motions for summary judgment, *see Mandalay Shores Cooperative Housing Association, Inc. v. Pierce,* 667 F.2d 1195, 1197 (5th Cir. Unit B 1982).[4]

■ This court's discussion as to whether the profits in question are entitled to capital gains or ordinary income treatment begins, as it must, with the principal general provisions of the tax law dealing with such issues, in particular, section 1221. *Suburban Realty Co. v. United States,* 615 F.2d 171, 177–78 (5th Cir.), *cert. denied,* 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). This section, in conjunction with other general provisions of law,[5] provides in substance for capital gains treatment for all property held by the taxpayer with certain exceptions, in this case the relevant exception being "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."[6] Therefore, in resolving whether certain profits reaped by Sanders in 1974 and 1975 are entitled to capital gains treatment, this court must address and answer three questions:

1. was taxpayer engaged in a trade or business, and, if so, what business?

2. was taxpayer holding the property primarily for sale in that business?

3. were the sales contemplated by taxpayer "ordinary" in the course of that business?

*Suburban Realty Co., supra,* 615 F.2d at 178 (footnote omitted). Furthermore, in *Suburban Realty Co.* the appellate court pointed to several factors which are relevant, to a greater or lesser extent, in answering the above three questions posed by section 1221. 615 F.2d at 179. These factors are:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.

615 F.2d at 176 n. 16, *quoting from United States v. Winthrop,* 417 F.2d 905, 910 (5th Cir.1969). *See also Biedenharn Realty Co., supra,* 526 F.2d at 415 & n. 22. Of these, "[s]ubstantiality and frequency of sales is called the most important factor" and "[i]mprovements to the land, solicitation and advertising efforts, and brokerage activities also play an important part." *Suburban Realty Co., supra,* 615 F.2d at 176. In fact, it has been held that the "conjunction of frequent and substantial sales with development activity relating to the properties in dispute ... 'will usually conclude the capital gains issue against [the] taxpayer.'" *Suburban Realty Co., supra,* 615 F.2d at 176 (citations omitted), *quoting from Biedenharn Realty Co., supra,* 526 F.2d at 418. *See also Houston Endowment, Inc., supra,* 606 F.2d at 81, ("ordinary income tax rates usually apply when dispositions of subdivid-

---

4. Neither side to this lawsuit has contended that this matter is inappropriate for resolution on motions for summary judgment.

5. The other principal general provisions are found in 26 U.S.C.A. §§ 1202, 1222.

6. The other exceptions are not relevant to this case.

ed property over a period of time are continuous and substantial rather than few and isolated.") With these guiding factors in mind, the court will now address the three questions posed by section 1221.

*Was Sanders engaged in the real estate business?* The evidence is overwhelming that Sanders was engaged in the real estate business. Over a period of almost a decade he engaged in extensive activities to subdivide, prepare, and sell a portion of his land. These activities included subdividing the land into 98 lots, arranging for water facilities and power and gas lines, having streets paved, securing appropriate financing, constructing houses on some lots, using real estate brokerage firms to arrange sales and advertising, and engaging in some advertising himself. Furthermore, he was successful in his efforts, selling all but one of the lots in Paige Hills Estates by 1976 and starting a new subdivision called Crossgate. The evidence undisputedly reflects that over a long period of time Sanders engaged in substantial and extensive efforts to set up his real estate business, including some improvements of the land to be sold, that he engaged in substantial and frequent sales, and that he devoted much, if not most, of his time to his real estate business.

The fact that he did not purchase any additional property does not detract from the conclusion that he was engaged in the real estate business. He "merely had enough land to do a large business without buying any more." *Biedenharn Realty Co., supra,* 526 F.2d at 417, *quoting from Snell v. Commissioner of Internal Revenue,* 97 F.2d 891, 893 (5th Cir.1938). *See also Suburban Realty Co., supra,* 615 F.2d at 182.

*Was Sanders holding the land, the 42 acres, primarily for sale in his real estate business?* Sanders contends, and this court agrees, that his primary purpose for acquiring the property was as an investment, to keep the land for his parents, and not to set up a real estate business. However, the court's inquiry does not end here because "intentions at the time of acquisition of the asset do not control the characterization of the proceeds of its sale." *Suburban Realty Co., supra,* 615 F.2d at 183. *See also Ridgewood Land Co. v. Commissioner of Internal Revenue,* 477 F.2d 135, 136 (5th Cir.1973) (per curiam); *Fahs v. Crawford,* 161 F.2d 315, 317 (5th Cir.1947). The evidence is clear that at the time of the sales from 1967 to 1976 Sanders's primary purpose as to the 42 acres was to develop the land to be resold as a part of the real estate business already described.[7]

*Were the sales contemplated by Sanders "ordinary" in the course of his business?* Again the answer is yes. In *Suburban Realty Co.,* the appellate court observed that:

> The concept of normalcy requires for its application a chronology and a history to determine if the sales of lots to customers were the usual or a departure from the norm. History and chronology here combine to demonstrate that [taxpayer] did not sell his lots as an abnormal or unexpected event.

615 F.2d at 185–86, *quoting from United States v. Winthrop, supra,* 417 F.2d at 912. The timing and magnitude of the sales made by Sanders between 1967 and 1976 do not reflect isolated, unexpected, unusual acts; rather they reflect planned, continuous sales over a number of years.

Having answered the three questions posed by section 1221 in the affirmative, this court concludes, as it must, that the profits earned by Sanders from sale of lots without houses in 1974 and 1975 are not entitled to capital gains treatment under the general provisions of section 1221, but rather are to be treated as ordinary income. This conclusion, however, still leaves for the court's consideration Sanders's alternative

---

7. Moreover, "where sales are continuous [as with Sanders's business between 1972 and 1976,] the nature and purpose of a taxpayer's acquisition of property is significant only where sales activity results from 'unanticipated, externally introduced factors which make impossible the continued preexisting use of the realty' "—factors such as "acts of God" and "new and unfavorable zoning regulations." *Houston Endowment, Inc., supra,* 606 F.2d at 82, *quoting from Biedenharn Realty Co., supra,* 526 F.2d at 421. No such factors were present in the instant case.

contention that the profits are entitled to capital gains treatment under the special provisions of section 1237.

### B. Section 1237

█ Section 1237 provides a limited exception to the provisions of section 1221. Under section 1237 a taxpayer may claim capital gains treatment on the sale of subdivided lots even if he or she otherwise would be deemed to have sold the lots in the ordinary course of business, if he or she complies with certain requirements set out in the section.[8] These requirements, in summary, are:

He cannot have held any part of the tract at any time previously for sale in the ordinary course of his business, nor in the year of sale held any other real estate for sale to customers; he cannot make substantial improvements on the tract which increase the value of the lot sold substantially; and he must have owned the property 5 years, unless he inherited it.

Treasury Regulations, § 1.1237–1(a)(5). Furthermore, even if a taxpayer has made substantial improvements which substantially enhance the value of the property, the taxpayer may still be entitled to section 1237 treatment

if the lot or parcel is held by by the taxpayer for a period of 10 years and if—
(A) such improvement is the building or installation of water, sewer, or drainage facilities or roads (if such improvement would except for this paragraph constitute a substantial improvement);
(B) it is shown to the satisfaction of the Secretary that the lot or parcel, the value of which was substantially enhanced by such improvement, would not have been marketable at the prevailing local price for similar building sites without such improvement; and
(C) the taxpayer elects, in accordance with regulations prescribed by the Secretary, to make no adjustment to basis of the lot or parcel, or of any other property

owned by the taxpayer, on account of the expenditures for such improvements. Such election shall not make any item deductible which would not otherwise be deductible.

26 U.S.C.A. § 1237(b)(3). The United States contends that this court is without jurisdiction to entertain this alternative contention based on section 1237. The court agrees.

26 U.S.C.A. § 7422(a) provides that:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

Section 301.6402–2(b)(1) of the Treasury Regulations requires that the claim for refund "must set forth in detail each ground upon which a ... refund is claimed and facts sufficient to apprise the Commissioner [of the Internal Revenue Service] of the exact basis thereof.... A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund...." *Stoller v. United States,* 444 F.2d 1391, 1393 (5th Cir.1971). The logic behind this regulation requirement is two-fold. First, the Internal Revenue Service should be given an opportunity to "correct claimed errors in the first instance and, if disagreement persists, to limit the litigation to the issues which have been reexamined by the Commissioner and which he is prepared to defend." *Carmack v. Scofield,* 201 F.2d 360, 362 (5th Cir.1953), Second,

The Commissioner should not be left to his own devices in order to discover the precise nature of a taxpayer's claim and

---

**8.** Section 1237 does not allow capital gains treatment for all the profits from the sale of lots which meet section 1237 requirements. The section dictates, in general, that up to five

percent of the profit from the sale of lots be treated as ordinary income, once the taxpayer has sold more than five lots from the tract of land.

thus be placed in a position of having to hazard a guess. It would have been very simple for the taxpayers here to state in their claim for refund that the assignment had been effected for the valuable consideration aforementioned. If they had, perhaps this case would have never seen its way into this court. The Commissioner does not possess the time or resources to perform extensive investigations into the precise reasons and facts supporting every taxpayer's claim for refund. The need for investigation can be easily obviated by a taxpayer who takes the proper care in preparing his claim for refund.

*Stoller, supra,* 444 F.2d at 1393. The Internal Revenue Service is therefore allowed to "take the claim at its face value and examine only those points to which [its] attention is necessarily directed." *Alabama By-Products v. Patterson,* 258 F.2d 892, 900 (5th Cir.1958), *cert. denied,* 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959).

In the instant case, the only reference to section 1237 was made in the amended tax forms filed by Sanders in 1979. The relevant portions of the forms are given verbatim in an earlier part of this opinion. The amended forms fall far short of alleging "facts" sufficient to apprise the Internal Revenue Service that the lots in issue met all the requirements necessary for section 1237 treatment. The only factual allegations made in the forms are that Sanders had held the property "for over ten years" and that the property was "not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." These allegations by themselves were not enough to entitle Sanders to the tax benefits of section 1237; and the Internal Revenue Service, taking the claim at its face value, properly denied the claim. In particular, the amended forms failed to present the factual allegations, now advanced by Sanders and vigorously denied by the United States, that any improvements to the lots in issue were not substantial and did not substantially enhance the value of the lots. This lawsuit is the first time that Sanders has made these factual allegations.

This, Sanders may not do at this *stage.* The Internal Revenue Service simply "could not have known these facts without an investigation, and there was nothing to put [it] on notice that a further investigation was needed." *Stoller, supra,* 444 F.2d at 1393. Therefore, Sanders's failure at the administrative level to present sufficient facts to put the Internal Revenue Service on notice of the substance of his alternative section 1237 claim precludes this court from now hearing this claim. *See, e.g., id; Fearis v. Commissioner of Internal Revenue,* 548 F.Supp. 408 (N.D.Texas 1982).

### III. Conclusion

In conclusion, this court is of the opinion, first, that based upon the undisputed evidence the section 1221 claim advanced by Sanders is without merit, that is, that the profits made by Sanders from the sale of lots without houses in 1974 and 1975 are not entitled to capital gains treatment; and, second, that the court is without jurisdiction to entertain the alternative section 1237 claim advanced by Sanders. For these reasons, the motion for summary judgment filed by the United States is due to be granted, and the motion for summary judgment filed by Sanders is due to be denied.

An appropriate judgment will be entered in accordance with this opinion.