**HOUSTON ENDOWMENT, INC.,
Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

No. 77–1680.

United States Court of Appeals,
Fifth Circuit.

Nov. 7, 1979.

Gilbert E. Andrews, Act. Chief, App. Section, Dept. of Justice, William A. Friedlander, Asst. Chief, Tax Div., Washington, D. C., M. Carr Ferguson, Asst. Atty. Gen., Robert Bernstein, David Carmack, Michael L. Paup, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Walter P. Zivlev, Fred E. Croshaw, Houston, Tex., for plaintiff-appellee.

Before WISDOM, HILL and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

This case presents the recurring conundrum whether property sold by a taxpayer was held primarily for investment or for sale to customers in the ordinary course of business. The taxpayer, Houston Endowment, Inc. [Houston Endowment], a successor to Bankers Mortgage Company [Bankers], filed suit against the United States for a refund of $218,023.41 of federal income taxes paid for the years 1968, 1969, and 1970, plus interest. Houston Endowment had paid the additional tax plus interest after the Internal Revenue Service insisted that ordinary income tax rates rather than capital gains rates were applicable to profits realized by Bankers from the sales of certain real property. In the district court, a jury concluded that the property sold by Bankers had been held primarily for investment thereby qualifying the sales for a capital gains tax, and awarded the refund. The United States appealed. We reverse. We hold that the district court erred in denying the government's motion for judgment notwithstanding the verdict, because the evidence as a matter of law required a finding that the property sold by the taxpayer was held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

I

The critical underlying facts in this case are not in dispute. Instead, the dispute is over the significance of the facts in light of the criteria this Court has established for resolving whether capital gains tax rates or ordinary income tax rates are applicable to the sale of real property. *Biedenharn Realty Co. v. United States*, 5 Cir. 1976, 526 F.2d 409 (en banc), *cert. denied*, 1976, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 is the controlling case. *See also United States v. Winthrop*, 5 Cir. 1969, 417 F.2d 905.

Houston Endowment, a charitable foundation organized under the laws of Texas, is a successor to Bankers Mortgage Company,

a Texas corporation engaged in the money lending business since 1920. Prior to 1933, Houston Terminal Land Company [Houston Terminal] was indebted to Bankers, as evidenced by promissory notes secured by deeds of trust against 1264 acres of land near downtown Houston, Texas. During the 1920's Houston Terminal, in financial straits, defaulted on the promissory notes. In 1933, after Houston Terminal had become a wholly owned subsidiary of Bankers, title to the land was transferred to another wholly owned subsidiary of Bankers, Mortgage Land & Investment Corporation, by conveyance in lieu of foreclosure. The notes, however, remained in default and were transferred to a third subsidiary of Bankers, Midland Mortgage Company. In 1937 the notes were acquired by Bankers and in 1942, after one last paper transaction, Bankers formally foreclosed on the property and became record owner of the 600 to 900 acres that remained of the original 1264 acre tract. Beginning in 1942, Bankers engaged in efforts to dispose of the property that continued until 1969. This suit concerns the proper tax treatment of profits reported by Bankers in 1968, 1969, and 1970 that are attributable to installment sales of various parcels from a particular 200 acre tract on the foreclosed property.

■ Although we are concerned with whether a specific 200 acres of the property acquired by Bankers was a capital asset within the meaning of 26 U.S.C. § 1221, it is necessary for us to examine the activities of Bankers with respect to the entire tract of land acquired by Bankers' subsidiary, Mortgage Land & Investment Corporation, in 1933. According to the testimony of Bankers' witnesses in the trial court, the original 1264 acre tract was situated two miles from downtown Houston. Despite the proximity of the property to downtown Houston, the property was unattractive to industrial and residential purchasers when Bankers acquired the property; it was unimproved and largely inaccessible. Poor economic conditions during the 1930's hindered efforts to sell the property. In the late 1930's, however, as the City of Houston extended various services into portions of the tract, Bankers was able, through its subsidiary, to sell some of the property. Bankers contends that throughout the 1930's it was unable to liquidate, at a reasonable price, its investment in the 200 acre tract which is the subject of this litigation. By 1942, however, when Bankers formally foreclosed on the property owned at that time by its subsidiary, only 600 to 900 acres of the original tract remained unsold.

By 1942 economic conditions had improved, and Bankers stepped up its efforts to sell the property. Although Bankers did not work up plats for the property, Bankers did utilize, to an extent, subdivisions on the property originally platted in the 1890's. Bankers spent $600,000 to $700,000 constructing concrete streets, water lines, and storm and sanitary sewers on previously subdivided portions of the tract. Bankers sold lots from this area primarily to residential purchasers. During the 1940's Bankers gradually developed other portions of the tract in a similar manner and sold lots by metes and bounds to industrial purchasers. The development of industrial sites continued until 1952 when Bankers improved the 200 acres in question. The improvements on the 200 subject acres included streets, water lines, storm and sanitary sewers, and railroad spur tracks to give the purchasers access to the Southern Pacific Railway. Total expenditures on the industrial sites during the 1940's and 1950's approached $1,000,000.

Sales of property to residential and commercial purchasers from 1942 to 1970 were continuous and substantial. Total profits from the sale of property during this period were $5,741,026 and averaged 31 percent of Bankers' income on a yearly basis. *See* Appendix. Bankers asserts, however, that throughout this period the company retained its role as a lending institution and never held itself out as being engaged in the business of selling real estate. Bankers admits improving the subject acreage in an effort to maximize profit but contends that its sales constituted gradual liquidation of an investment in the only manner possible

in light of the conditions of the Houston real estate market during that period.

As evidence of its passive liquidation efforts, Bankers points out that at no time did it have a real estate license, advertise the property for sale, or conduct an active sales campaign. The property was not listed with real estate brokers, but certain brokers were informed that the property was for sale and were paid a commission on all sales. Nevertheless, sales were steady despite the lack of an active sales force or organized sales campaign.

## II

This Court has often wrestled with the question presented here. The pertinent decisions, however, are not easily reconciled. Often they rest on subtle factual distinctions. Recently, however, in *Biedenharn Realty Co. v. United States*, 5 Cir. 1976, 526 F.2d 409 (en banc), this Court went to great lengths to identify the common themes running through previous decisions and to clarify the balancing test set forth in *United States v. Winthrop*, 5 Cir. 1969, 417 F.2d 905. This test must be utilized in determining whether property sold by a taxpayer was held as a capital asset within the meaning of 26 U.S.C. § 1221.[1] In *Biedenharn* we endorsed, in order of importance, the principal *Winthrop* factors that must be examined to determine whether property has been sold to customers in the ordinary course of business. These are: the substantiality and frequency of sales, improvements, solicitation and advertising efforts, and brokers' activities. Of particular importance in this case is *Biedenharn*'s discussion of the weight to be accorded the nature and purpose of the taxpayer's acqui-sition of the property. When the facts of a particular case are established relative to these factors, this Court may exercise plenary review of the district court's ultimate legal determination.[2]

We examine first the facts in light of the most important *Biedenharn* factor, the frequency and substantiality of sales. Although this factor is not dispositive of the tax question, recent Fifth Circuit cases support the view that ordinary income tax rates usually apply when dispositions of subdivided property over a period of time are continuous and substantial rather than few and isolated. *Biedenharn*, 526 F.2d at 416, (citing *United States v. Winthrop*, 5 Cir. 1969, 417 F.2d 905; *Thompson v. Commissioner*, 5 Cir. 1963, 322 F.2d 122; *Gamble v. Commissioner*, 5 Cir. 1957, 242 F.2d 586, 591; *Brown v. Commissioner*, 5 Cir. 1944, 143 F.2d 468, 470).

This case concerns profits that accrued in 1968, 1969, and 1970 on installment sales of lots from a particular 200 acres of the tract acquired by Bankers through its subsidiary in 1933. Nevertheless, the question whether Bankers was selling property in the ordinary course of business may be answered only by focusing on the sales pattern relative to the entire tract of land acquired by Bankers in 1933. *Biedenharn*, 526 F.2d at 416.

The record reveals that Bankers' sales of property beginning in 1942 were continuous and substantial for 27 years. *See* Appendix. The government's exhibits show that Bankers consummated 230 sales during this period, recognized profits exceeding $5,700,-000, and obtained almost 31 percent of its average annual income from the sale of this property.[3]

---

1. Title 26 U.S.C. § 1221 provides in part:
   [T]he term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business . . . .

2. *Biedenharn*, 526 F.2d at 416 n.25.

3. In *Biedenharn*, the taxpayer's profits from the sale of real estate were taxed at ordinary income rates even though the profits constituted only 11.1 percent of the taxpayer's average annual income. *Biedenharn*, 526 F.2d at 419. In *Winthrop* income from property sales was 52.4 percent of the taxpayer's average annual income. *Winthrop*, 417 F.2d at 907.

Houston Endowment argues, however, that its sales of property represented the passive liquidation of an unattractive investment in the only manner possible under the circumstances. Houston Endowment seeks support for its liquidation theory from several pre-*Biedenharn* cases. *See, e. g., Estate of Barrios v. Commissioner*, 5 Cir. 1959, 265 F.2d 517; *Riedel v. Commissioner*, 5 Cir. 1958, 261 F.2d 371; *Alabama Mineral Land Co. v. Commissioner*, 5 Cir. 1957, 250 F.2d 870; *Kanawha Valley Bank*, 4 T.C. 252 (1944); *Thompson Lumber Co. v. Commissioner*, 43 BTA 726 (1941). Although some facts in the cases cited by Houston Endowment bear similarities to the instant controversy, none of the cases compels capital gains treatment in this case, especially in view of the more recent and controlling *Biedenharn* decision.

Reconciliation of the cases dealing with 26 U.S.C. § 1221 is fruitless. Each case turns on an analysis of its facts. *See Biedenharn*, 526 F.2d at 415; *Winthrop*, 417 F.2d at 906; *Thompson v. Commissioner*, 5 Cir. 1963, 322 F.2d 122, 127. Here the facts reflect continuous sales of property to the point of exhaustion as an ordinary profitable part of Houston Endowment's business. *See Thompson*, 322 F.2d at 127–28.

Houston Endowment asserts that its original investment intent contradicts the existence of sales in the ordinary course of business. This may be true. But although a taxpayer may have acquired property without intending to enter the real estate business, "what was once an investment, or what may start out as a liquidation of an investment, may become something else". *Biedenharn*, 526 F.2d at 417 (quoting *Thompson*, 322 F.2d at 127–28). *Biedenharn* did not reject initial investment intent as a consideration in cases such as this. The Court in *Biedenharn* pointed out, however, that where sales are continuous the nature and purpose of a taxpayer's acquisition of property is significant only where sales activity results from "unanticipated, externally introduced factors which make impossible the continued preexisting use of the realty". *Biedenharn*, 526 F.2d at 421. Original investment intent is pertinent, for example, when a taxpayer is coerced to sell its property by acts of God, new and unfavorable zoning regulations, or other uncontrollable forces. *Id.* In this case there was no coerced change of purpose of the nature described in *Biedenharn*. Houston Endowment's substantial and continuous disposition of property indicates sales in the ordinary course of business rather than forced liquidation.

In examining *Biedenharn*'s second factor, improvements, we find further support for the conclusion that Houston Endowment sold property from the 200 acres in question, as well as from the remainder of the original tract, in the ordinary course of business. In 1952, Bankers constructed concrete roads, water lines, storm and sanitary sewers, and railroad spur tracks on the 200 acres in question to enhance the attractiveness of the land to industrial purchasers and to increase its return on the sale of the property.

The improvements in this case are substantially similar to the taxpayer's improvements in *Winthrop* and *Biedenharn*. In those cases, the taxpayers extended electric lines to their property in addition to constructing improvements. The nature of the improvements in those cases is not significantly different from the improvements in this case. Houston Endowment, citing the *Estate of Barrios v. Commissioner*, 5 Cir. 1959, 265 F.2d 517, argues, however, that the construction of streets, drainage facilities, and water lines was absolutely necessary to sell the property in question, and did not warrant a finding of sales in the ordinary course of business. An important fact in *Barrios*, absent here, was an unavoidable external force that rendered the taxpayer's continued use of the property as a farm infeasible. *Estate of Barrios*, 265 F.2d at 518; *see Biedenharn*, 526 F.2d at 421.

Finally, Houston Endowment points out that *Winthrop* and *Biedenharn* involved the sale of subdivided land, but in this case the company did not subdivide the 200 acre tract in question. Although Houston Endowment did not subdivide the 200 acre

tract, the record shows that Bankers intended to sell the property principally to industrial purchasers who typically purchase land by metes and bounds rather than as subdivided lots.[4] We conclude, in light of the other improvements on the property, that Bankers' failure to subdivide the 200 acre tract does not compel capital gains treatment of the profits realized from the sale of the property.

The substantial and continuous sales and the construction of extensive improvements strongly support a finding that Bankers was engaged in the sale of property in the ordinary course of business from the 1940's through the 1960's. *See Biedenharn*, 526 F.2d at 418; *Thompson*, 322 F.2d at 124–26. Houston Endowment argues, nevertheless, that capital gains treatment is appropriate since the property was never advertised for sale nor were brokers hired to sell the property. As this Court has pointed out, a taxpayer may sell property in the ordinary course of business despite lack of advertising efforts or brokerage activity where favorable market conditions render unnecessary any active solicitation of customers. *Beidenharn*, 526 F.2d at 418. Although Houston Endowment argues that the market for unimproved real estate in Houston was not favorable during the period in question, this argument is immaterial because Bankers improved the real estate and had no problems selling the property without advertising and brokerage activity. In light of the substantial and continuing sales and improvements, with respect to the 200 acres in question as well as the rest of the tract acquired in 1933, the profits accruing during 1968, 1969, and 1970 were the result of sales in the ordinary course of business within the meaning of 26 U.S.C. § 1221(1).

The role of the trier of fact (court or jury) is to determine the underlying facts. The weighing of the various factors, to determine the ultimate issue of whether the taxpayer holds the property primarily for sale to customers in the ordinary course of

his trade or business, is a legal issue for this Court to decide. *Biedenharn*, 526 F.2d at 416 n.25. On the facts of this case, however, reasonable men on a jury could have reached no other conclusion under the law of this circuit than that the taxpayer held the property primarily for sale to customers in the ordinary course of its trade or business.

Houston Endowment contends, in the alternative, that it is entitled to capital gains treatment under 26 U.S.C. § 1237 even though the property fails to qualify as a capital asset under 26 U.S.C. § 1221. Assuming § 1237 is pertinent, the parties are in dispute as to whether § 1237 applies according to its wording in 1970 or as amended retroactively in 1971 by Pub.Law 91–686, 84 Stat. 2071. Houston Endowment contends that it qualifies for capital gains treatment under either version of § 1237, but argues that the 1970 version is applicable in this case since the retroactive 1971 amendment to § 1237 is unconstitutional.

We find it unnecessary to rule on the constitutionality of the 1971 amendment to § 1237. Houston Endowment fails to qualify for capital gains treatment under either the 1971 amendment or under the pre-1971 statute. For the sale of subdivided real estate to qualify for capital gains tax under the 1970 version of § 1237, the property must have been "acquired through the foreclosure of a lien thereon which secured the payment of an indebtedness to the taxpayer or (*in the case of a corporation*) to a creditor who has transferred the foreclosure bid to the taxpayer in exchange for all of its stock . . ." (emphasis added). 26 U.S.C. § 1237(a), (b)(3). The original 1264 acre tract was acquired in 1933 by Bankers' subsidiary, Mortgage Land & Investment Corporation, by a voluntary conveyance in lieu of foreclosure from Houston Terminal which by that time was also a wholly owned subsidiary of Bankers. The property was acquired either by purchase when Bankers became the owner of the stock of Houston

---

4. Houston Endowment did sell a substantial amount of subdivided residential property from

portions of the original tract not intended for sale to industrial purchasers.

Terminal or by conveyance in lieu of fore-closure when title was transferred from Houston Terminal to Mortgage Land & Investment Corporation. There was no fore-closure by Bankers following the transfer of foreclosure bids by a creditor of Bankers in exchange for Bankers' stock as required under the pre-1971 version of § 1237.

Houston Endowment fails to qualify under § 1237 as amended in 1971 by Pub.Law 91–686. The 1971 amendment requires that the property in question be acquired by a corporation before 1934 by a foreclosure. Moreover, the foreclosure bids must have been transferred to the corporation by a creditor or creditors in exchange for all of the corporation's stock. In this case, there was neither a pre-1934 foreclosure nor a transfer of foreclosure bids by a creditor of Bankers in exchange for all of Bankers' stock. Because the sales from the 200 acre tract do not qualify for capital gains tax under § 1237, our conclusion that the profits reported from 1968 to 1970 resulted from sales in the ordinary course of business under 26 U.S.C. § 1221 is controlling.

The judgment is REVERSED with instructions to enter a judgment for the United States.

APPENDIX

(Defendant's Exhibit 7)

27–YEAR SUMMARY OF SALES OF REALTY BY BANKERS MORTGAGE COMPANY

| Year | Annual Profits From Sales of Realty * | Other Income * | Total Income * |
|------|------|------|------|
| 1942 | $ -0- | $ 131,104 | $ 131,104 |
| 1943 | 40,238 | 213,976 | 254,214 |
| 1944 | 74,793 | 52,867 | 127,660 |
| 1945 | 118,058 | 687,524 | 805,582 |
| 1946 | 263,216 | 585,874 | 849,090 |
| 1947 | 184,629 | 178,187 | 362,816 |
| 1948 | 148,366 | 252,300 | 400,666 |
| 1949 | 103,293 | 245,309 | 348,602 |
| 1950 | 241,707 | 261,600 | 503,307 |
| 1951 | 195,676 | 234,392 | 430,068 |
| 1952 | 118,975 | 277,833 | 396,808 |
| 1953 | 314,342 | 243,421 | 557,763 |
| 1954 | 474,771 | 264,394 | 739,165 |
| 1955 | 174,128 | 252,741 | 426,869 |
| 1956 | 385,968 | 283,075 | 669,043 |
| 1957 | 40,836 | 301,834 | 342,670 |
| 1958 | 64,898 | 258,742 | 323,640 |

| Year | Annual Profits From Sales of Realty * | Other Income * | Total Income * |
|------|------|------|------|
| 1959 | $ 229,917 | $ 299,499 | $ 529,416 |
| 1960 | 156,925 | 324,333 | 481,258 |
| 1961 | 141,635 | 338,915 | 480,550 |
| 1962 | 360,151 | 385,793 | 745,944 |
| 1963 | 167,347 | 407,981 | 575,328 |
| 1964 | 178,329 | 394,615 | 572,944 |
| 1965 | 337,462 | 444,363 | 781,825 |
| 1966 | 164,572 | 456,434 | 621,006 |
| 1967 | 331,705 | 503,099 | 834,804 |
| 1968 | 325,733 | 3,181,455 | 3,507,228 |
| 1969 | 289,728 | 726,139 | 1,015,867 |
| 1970 | 113,588 | 665,386 | 778,974 |
| TOTAL | 5,741,026 | 12,853,185 | 18,594,211 |

* Figures have been rounded off to the nearest dollar