GUARDIAN INDUSTRIES CORP. AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27308-87.         Filed September 11, 1991.

---

*C. David Swenson, A. Duane Webber,* and *David N. Bowen,* for the petitioners.

*Robert J. Kastl* and *James E. Kagy,* for the respondent.

WELLS, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Deficiency |
| --- | --- |
| 1983 | $8,128,580 |
| 1984 | 728,942 |

After concessions by both parties, the sole issue remaining for decision is whether silver-bearing waste material generated in the course of petitioners' photo-finishing business is property held by petitioners primarily for sale to customers in the ordinary course of petitioners' trade or business.

### FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91.[1] The stipulations and accompanying exhibits are incorporated in this opinion irrespective of any restatement below. When the petition in the instant case was filed, petitioners' principal place of business was located in Northville, Michigan.

Petitioners are engaged in three principal lines of business: the manufacture of glass (glass); the manufacture of insulation products (insulation); and the finishing of photographs (photo-finishing). Gross revenues of each line of business for the years in issue were as follows:

---

[1]Unless otherwise noted, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

|  | 1983 | 1984 |
|---|---|---|
| Glass | $358,053,000 | $406,009,000 |
| Photo-finishing | 83,823,000 | 96,648,000 |
| Insulation | 22,926,000 | 33,120,000 |

Pretax income from photo-finishing equaled $7,934,000 in 1983 and $6,446,000 in 1984.

Petitioners entered the photo-finishing business in 1968 by purchasing ABC Photo. At that time, ABC Photo operated one plant, at Northville, Michigan, and had been in business since 1955. Petitioners expanded their photo-finishing business into new markets during the 1970s and 1980s by acquiring other finishers and constructing new plants.

During the years in issue, petitioners operated as few as 10 and as many as 12 photo-finishing plants across the United States, and employed approximately 1,500 persons in connection with their photo-finishing operations. Petitioners performed photo-finishing services for 9,500 national and regional chain stores, discount stores, and independent retail outlets (retail outlets), which in turn offered photo-finishing services to amateur photographers. Petitioners also supplied photographic products to the retail outlets.

Petitioners collected exposed film from the retail outlets on a daily basis, processed the film in their plants, and returned developed images and negatives to the retail outlets. In order to maintain its competitive position in the market, a photo-finisher was expected to process film within 24 hours. Furthermore, the terms of petitioners' agreements with the retail outlets did not allow petitioners to charge for prints and film that were not returned within 24 hours of pickup. Petitioners accordingly processed film within 24 hours of receipt.

Photography involves the use of silver halide compounds, which record images when exposed to light. Both photographic film and the paper used for making prints contain silver halide compounds. Various chemical solutions are used to develop and fix latent images on film and paper (photo-finishing solutions). High quality alternatives to the silver compounds and chemical processes used to produce the final photographic image do not exist.

In black and white photography, the exposed silver compounds react with the developer solution to form the final image, while unexposed silver is washed away in the fixing baths. In color photography, various dyes are incorporated into the film and paper in addition to the light-sensitive silver halides, and a chemical reaction between the developer solution, the silver halide compounds, and the dyes produces the color image. After the chemical reaction occurs, the silver halides must be removed from the film or paper because they otherwise would hide the color image. Removal is accomplished by passing the film or paper through bleaching and fixing solutions in which the silver halides react with other chemicals to form silver thiosulfate. After the silver halides are removed, the silver compounds have no further utility in the developing process. Approximately 60 percent of the silver compounds introduced into photo-finishing solutions are attributable to photographic paper, while the remaining 40 percent are attributable to film. The photographic paper is purchased by petitioners as a raw material, whereas the exposed film is furnished by petitioners' customers for developing.

During the years in issue, petitioners utilized a "closed-loop" photo-finishing system, which mixed new and used photo-finishing solutions and continuously recirculated the solutions within the system. Petitioners' predecessor, ABC Photo, began to use such a system for some film processing in 1963, and had installed a closed-loop system in its newly constructed Northville, Michigan, plant when petitioners acquired it in 1968. Petitioners installed closed-loop systems in the finishing plants they built or purchased between the time they entered the photo-finishing business and the years in issue. Use of such a system was necessary in order to be competitive in the photo-finishing industry, as it was the most efficient and least time-consuming method of processing film and prints on a high-speed basis. The closed-loop system enabled petitioners to reduce the volume of solutions used in their operations by two to four times, which saved labor, material, and storage costs. Additionally, use of a closed-loop system reduced the volume of discharge required to be treated prior to disposal, thus decreasing the cost of compliance with applicable environmental laws.

In order to reuse solutions in the closed-loop process, petitioners had to remove certain material, including silver thiosulfate, from the photo-finishing solutions. The silver thiosulfate that was washed from film and paper contaminated the photo-finishing solutions and interfered with the ability of the solutions to produce negatives and prints of marketable quality. To remove silver thiosulfate, among other substances, from their photo-finishing solutions, petitioners incorporated electrolytic cells (cells) into the closed-loop system. Petitioners' predecessor, ABC Photo, first used cells in 1962 or 1963, and was operating them in its Northville, Michigan, plant prior to its acquisition by petitioners in 1968. Petitioners installed cells in each plant they built or acquired between 1968 and the years in issue. The cells passed an electric current through the solutions, causing silver and other substances to be deposited on the cells' cathodes. The material deposited on the cathodes, called "flake," consisted of, on average, 92 percent silver, with the remainder of the material consisting of other substances removed by electrolytic action (the silver and other substances removed from the photo-finishing solutions are hereinafter referred to as silver waste). Approximately 95 percent of the silver waste removed from the photo-finishing solutions was attributable to the cells in the closed-loop system.

To ensure continued efficient operation, the cells were cleaned at least once a month by scraping the built-up silver waste off the cathodes. The silver waste was then weighed and placed in containers for shipment to a refiner. Quality control personnel also prepared reports concerning the amount of silver waste collected, which was compared to the total amount of silver entering the photo-finishing process, in order to monitor the efficiency of the waste removal process and to detect pilferage. To further monitor the efficiency of processes used to remove silver waste from the solutions, petitioners also weighed scrap photographic paper prior to discarding it, although petitioners did not recover the silver compounds in such paper. Petitioners produced periodic reports concerning the percentage of silver in the developing process which was recovered, the dollar value of such silver, and the success of its plants in

meeting target recovery rates. Petitioners desired to maximize the silver content of the waste material.

During the years in issue, petitioners were subject to a variety of Federal, State, and local laws and regulations governing the levels of certain substances in the waste waters discharged from their plants into sewers or elsewhere (environmental regulations). The environmental regulations classified silver as a "toxic pollutant," and required petitioners to reduce significantly the concentration of silver thiosulfate in photo-finishing solutions before disposing of the solutions. Petitioners had to take steps to comply with environmental regulations beginning in 1968, and could not have complied with the standards in effect at that time without removing silver waste from their photo-finishing solutions.

Even though treatment in the closed-loop system removed much of the silver waste in the photo-finishing solutions, petitioners were required to further reduce the concentration of silver waste before discharging the solutions into the environment. Petitioners reduced the concentration of silver waste in the solutions by passing used photo-finishing solutions and wash waters through a system of electrolytic cells and steel wool cartridges (tailing process). Approximately 5 percent of all silver waste collected by petitioners was attributable to the tailing process. Material collected in the steel wool cartridges, called "sludge," contained between 1 percent and 9 percent silver. During 1984, petitioners recovered silver compounds from film scraps by placing them in the tailing process. Petitioners' quality control personnel checked the level of silver waste in the effluent every day to ensure compliance with environmental regulations. Silver waste collected in the tailing process was weighed and shipped to a refiner in the same manner as silver waste removed from the closed-loop system.

In order to continue in the photo-finishing business, petitioners had to comply with the environmental regulations. Severe penalties could be imposed for violation of the environmental regulations, including large fines for each day a violation of clean water standards continued, closure of petitioners' plants, and jail terms for petitioners' employees. The environmental regulations were enforced actively, and,

despite their best efforts to comply, petitioners occasionally were cited for discharging effluent containing excessive levels of silver waste. Petitioners would have removed the silver waste from the solutions in order to comply with the environmental regulations even if the silver waste had been valueless.

The silver waste generated by petitioners' plants was sold to refiners. Petitioners' predecessor, ABC Photo, had begun selling silver waste in 1958 or 1959. During the years in issue, Metalex Systems Corp., later known as Drew/Metalex (Metalex), purchased substantially all of the silver waste generated by petitioners' plants. Occasionally, petitioners sent a shipment or part of a shipment to another refiner in order to test the accuracy of Metalex's silver assay. Metalex, like other refiners, actively solicited petitioners and other finishers to sell their silver waste to it, maintaining a sales force for such purpose. Two contracts entered into by petitioners governed the sale of silver waste during the years in issue. The first contract applied to shipments of silver waste made after April 30, 1983, through July 31, 1984, and the second applied to shipments made after July 31, 1984. Metalex and petitioners conducted brief negotiations concerning each agreement, which Metalex had drafted.

Dealings between Metalex and petitioners during the years in issue followed a standard pattern. When a shipment was ready, petitioners placed the silver waste in containers provided by Metalex and then notified Metalex; Metalex arranged for the transportation of the silver waste to Metalex's plant at Metalex's expense. Risk of loss with respect to the silver waste passed to Metalex when the carrier took possession of the silver waste. Usually, one shipment per month was made from each plant, but a second shipment might have occurred during peak processing periods.

When the silver waste arrived at the refinery, Metalex defined the amount of silver in the silver waste, processed it to remove most impurities, and then resold it to another refiner for processing into marketable silver bullion. The price Metalex paid petitioners was based on the amount of silver in the shipment and the spot market price of silver 21

days after shipment, less refining and assay charges. The charges in the agreements were based on the understanding that petitioners would sell Metalex substantially all silver waste generated by their finishing plants in a year, approximately 23,000 pounds. Petitioners received $2,949,933 from sales of silver waste in 1983, and received $2,546,287 from silver-waste sales in 1984.

Petitioners originally reported the proceeds of silver-waste sales as ordinary income on their Federal income tax returns for the years in issue. Subsequently, petitioners amended such returns, recharacterizing such proceeds as short-term capital gain, and applied such proceeds against a long-term capital loss incurred after the years in issue that had been carried back to the years in issue.

OPINION

The issue we must decide is whether the silver waste was held by petitioners primarily for sale to customers in the ordinary course of their trade or business, as respondent contends, or whether the silver waste was held primarily for the operation of petitioners' photo-finishing business and then sold as an "incidental" part of such business.

Section 1221 provides the general rule that a capital asset is "property held by the taxpayer (whether or not connected with his trade or business)." Congress has provided in section 1221 five specific classes of property that comprise the exclusive exceptions to capital asset status. *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 218 (1988); *Azar Nut Co. v. Commissioner*, 94 T.C. 455, 461 (1990), affd. 931 F.2d 314 (5th Cir. 1991).

Congress intended that capital asset treatment be an exception to the normal requirements of the Code and that the profits generated by everyday business operations be ordinary income. *Malat v. Riddell*, 383 U.S. 569, 572 (1966); *Bauschard v. Commissioner*, 31 T.C. 910, 916 (1959), affd. 279 F.2d 115 (6th Cir. 1960). The Supreme Court in *Arkansas Best Corp.* held that the "general definition of the term 'capital asset'" encompasses all property not within the exclusions of section 1221. 485 U.S. at 218. Thus, it is clear that the narrow application of capital asset treatment

is a result of the broad reach of the statutory exceptions to such treatment.

Whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is essentially a question of fact, which must be decided by a consideration of all the surrounding circumstances. *Gartrell v. United States*, 619 F.2d 1150, 1152-1153 (6th Cir. 1980); *Broughton v. Commissioner*, 333 F.2d 492, 494-495 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; *Cottle v. Commissioner*, 89 T.C. 467, 486 (1987). Petitioners carry the burden of proving that the silver waste is a capital asset. *Case v. United States*, 633 F.2d 1240, 1244 (6th Cir. 1980); *Cottle v. Commissioner*, 89 T.C. at 485; Rule 142(a).

The controlling factor in determining the character of the silver waste is the purpose for which it is held, *Gotfredson v. United States*, 303 F.2d 464, 467 (6th Cir. 1962); *McCullough Transfer Co. v. Commissioner*, 27 T.C. 822, 832 (1957), which is to be determined as of the time of sale, although we may consider events occurring prior to such time in order to identify such purpose. *Cottle v. Commissioner*, 89 T.C. at 487. See also *Suburban Realty Co. v. United States*, 615 F.2d 171, 182-184 (5th Cir. 1980) (taxpayer's purpose at time of sale to be determined with reference to primary holding purpose prior to time of decision to sell). The determination of the taxpayer's holding purpose is for the trier of fact to make, based on the taxpayer's methods of operation and the standards customary in his line of business. *Gotfredson v. United States*, 303 F.2d at 467. In deciding the holding purpose issue, more weight is given to objective evidence than to the taxpayer's own statements of intent. *Philhall Corp. v. United States*, 546 F.2d 210, 215 (6th Cir. 1976); *Daugherty v. Commissioner*, 78 T.C. 623, 630 (1982).

To decide the character of the silver waste, we will consider a variety of factors which have been found useful in shedding light on the taxpayer's purpose for holding property; however, no single factor or combination of factors is dispositive. *Byram v. United States*, 705 F.2d 1418, 1424 (5th Cir. 1983); *Philhall Corp. v. United States*, 546 F.2d at 215; *Broughton v. Commissioner*, 333 F.2d at 495; *Cottle v. Commissioner*, 89 T.C. at 488. The factors

relevant to the instant case include: (1) The frequency and regularity of sales of the silver waste; (2) the substantiality of the sales and the relative amounts of income derived by petitioners from their regular business and the sales of the silver waste; (3) the length of time the silver waste was held; (4) the nature and extent of petitioners' business and the relationship of the silver waste to that business; (5) the purpose for which the silver waste was acquired and held prior to sale; (6) the extent of petitioners' efforts to sell the property by advertising or otherwise; and (7) any improvements made to the silver waste by petitioners. *Byram v. United States*, 705 F.2d 1418, 1424 (5th Cir. 1983); *Broughton v. Commissioner*, 333 F.2d at 495; *Mathews v. Commissioner*, 315 F.2d 101, 107 (6th Cir. 1963), affg. a Memorandum Opinion of this Court; *Cottle v. Commissioner*, 89 T.C. at 487-488.

Under *Malat v. Riddell*, 383 U.S. at 572, in order for a sale of property to be classified as ordinary, sale to customers[2] in the ordinary course of business must be "of first importance," or the "principal" reason that property is held. We hold that proceeds from petitioners' sales of silver waste should be characterized as ordinary income. Our conclusion is supported by a number of considerations.

Respondent argues that petitioners sold the silver waste on a regular and frequent basis, thus indicating that the silver waste was held for the purpose set forth in section 1221(1). Petitioners respond with the argument that the contracts between themselves and Metalex effected a single sale of all silver-waste shipments occurring during the time such contracts were in force.[3] Respondent counters, arguing that each shipment of waste to a refiner should be

---

[2]While the term "to customers" sometimes has been analyzed in isolation to determine whether property is described in sec. 1221(1), the question of whether a taxpayer is selling to customers is relevant chiefly in the case of persons dealing or trading in securities or commodities. See *King v. Commissioner*, 89 T.C. 445, 457-460 (1987); *Kemon v. Commissioner*, 16 T.C. 1026, 1032-1033 (1951). Outside the dealer/trader area, the term has been given such a broad meaning that separate consideration of it would not assist us in deciding the instant case. See *Patterson v. Belcher*, 302 F.2d 289, 294 (5th Cir. 1962); *S&H, Inc. v. Commissioner*, 78 T.C. 234, 243 (1982); *Bynum v. Commissioner*, 46 T.C. 295, 302 (1966) (Tannenwald, J., concurring); *Ashby v. Commissioner*, 37 T.C. 92, 98-99 (1961); *Black v. Commissioner*, 45 B.T.A. 204, 210 (1941).

[3]We note that other taxpayers have unsuccessfully attempted to reduce the probative value of the instant factor by claiming that multiple transfers of property should be treated as one because they were made pursuant to the terms of a single contract. *Bauschard v. Commissioner*, 31 T.C. 910, 915 (1959), affd. 279 F.2d 115 (6th Cir. 1960).

considered a separate sale. We agree with respondent that each shipment constitutes a separate sale.

In considering whether each shipment is a separate sale, we give the term "sale" its ordinary meaning, that is, a transfer of property for a fixed price in money or its equivalent. *Rogers v. Commissioner*, 103 F.2d 790, 792 (9th Cir. 1939), affg. 37 B.T.A. 897 (1938); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). See also Uniform Commercial Code (U.C.C.) sec. 2-106(1) (a "sale" consists of the passing of title from the buyer to the seller for a price). The question of whether a sale has occurred for Federal income tax purposes is essentially one of fact. *Derr v. Commissioner*, 77 T.C. 708, 724 (1981). The key to deciding that a sale of property has taken place is a finding that the benefits and burdens of ownership have shifted from seller to buyer. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1237. We must distinguish between an executory contract, which evidences an intent to sell, and the actual sales transaction. *Derr v. Commissioner*, 77 T.C. at 727; *Hoven v. Commissioner*, 56 T.C. 50, 56 (1971).

In *Grodt & McKay Realty, Inc. v. Commissioner, supra,* we considered various factors and circumstances in deciding whether a transfer of property occurred including: (1) Whether legal title has passed; (2) whether an equity has been acquired in the property; (3) whether the contract creates a present obligation on the parties to exchange legal title for the agreed price; (4) whether the right of possession is vested in the purchaser; and (5) which party bears the risk of loss with respect to the property. 77 T.C. at 1237-1238.[4]

Applying such factors, we hold that the sale of the silver waste occurred when it was shipped to Metalex, not when the contracts were executed. Although petitioners contracted to sell their entire output of silver waste to Metalex, we do not find that the execution of the contracts between Metalex and petitioners effected an immediate transfer of ownership in all silver waste produced during the periods

---

[4]See also U.C.C. sec. 2-401(2) (a transfer of title occurs when the seller completes his delivery obligation to the buyer; where a contract does not expressly require delivery at destination, title passes to the buyer at the time and place of shipment.)

they were in force. Petitioners did not possess the great bulk of the silver waste covered by the contracts at the time of execution. Manifestly, petitioners could not transfer what they did not own; furthermore, under the principles of the Uniform Commercial Code,[5] a transfer of title cannot occur until property is identified to the contract, see U.C.C. sec. 2-401(1), which, in the instant case, did not occur prior to the time the silver waste was extracted from the photo-finishing solutions. See U.C.C. sec. 2-501.

Shipment of the silver waste was made f.o.b. petitioners' place of business, and the risk of loss passed from petitioners to Metalex when such shipment was picked up by the common carrier for transport to Metalex. Metalex had neither the risks nor the benefits associated with ownership of the silver waste prior to shipment. For instance, if the silver waste had been stolen or destroyed prior to shipment, petitioners, and not Metalex, would have suffered the loss. Metalex was not obligated to pay a price for the silver waste until after shipment occurred. Consequently, until such time, the silver waste was petitioners' property; petitioners could, and sometimes did, sell some of it to other refiners. Therefore, the contracts upon which petitioners rely were executory in nature and a sale of silver waste did not occur until such material was shipped. Accordingly, we hold that each shipment was a separate sale.

Each of petitioners' 10 to 12 plants made shipments at least monthly while in operation during the years in issue. Respondent has argued, and petitioners do not dispute, that at least 228 shipments of silver waste occurred in the years in issue. A corollary to our conclusion that each shipment is

---

[5]We note that applicable State law frequently is relied upon in determining whether a sale has occurred for Federal income tax purposes. See, e.g., *Hoven v. Commissioner,* 56 T.C. 50, 55-56 (1971). While such law would be of assistance to us in arriving at such conclusion in the instant case, it is not readily apparent from the facts which State's law controls. The contracts between Metalex and petitioners do not specify that any particular State's law governs transactions occurring pursuant to their terms, and shipments of silver waste were made from plants in almost a dozen States. Consequently, the laws of various States could govern the respective shipments. We do not think it would serve any useful purpose to make findings as to which State's law governs the shipments from each plant. We note, however, that each State in which petitioners' plants are located has adopted the Uniform Commercial Code, and we believe that the question of when a sale of the silver waste occurred may be satisfactorily addressed by reference to the general provisions of the Uniform Commercial Code.

a separate sale is a holding that such sales create a pattern of frequent, regular, and continuous sales, and we so hold.

We also consider the amount of the proceeds of silver-waste sales during the years in issue, $2,949,933 in 1983 and $2,546,287 in 1984. The large dollar amount of the sales suggests that the property is held for the purpose described in section 1221(1). *Houston Endowment, Inc. v. United States,* 606 F.2d 77, 81 (5th Cir. 1979); *Biedenharn Realty Co. v. United States,* 526 F.2d 409, 419 (5th Cir. 1976).

Respondent argues that the percentage of petitioners' net income attributable to the silver-waste sales, 37.2 percent in 1983 and 39.5 percent in 1984, shows that the sales were substantial. Petitioners respond with the argument that the proceeds of silver-waste sales were not substantial, as they comprised only 3.5 percent of the $83,823,000 in revenues received by petitioners' photo-finishing business in 1983, and only 2.6 percent of the $96,648,000 in such revenues received in 1984. We do not find petitioners' comparison of the proceeds from silver-waste sales to total revenue, however, to be persuasive. The percentage of receipts attributable to silver-waste sales is low because petitioners' other activities produced large quantities of revenue, not because silver-waste sales yielded insubstantial income. In *Biedenharn Realty Co. v. United States, supra* at 419, the Fifth Circuit stated that allowing capital asset treatment on the basis of such relative percentages "would be sanctioning special treatment for * * * [taxpayers] arranging their business activities so that the income accruing to * * * [the sale of property in issue] represents only a small fraction of * * * [the taxpayer's] total gains." Moreover, in judging substantiality, a comparison of the size of the gains to the taxpayer's net income rather than to the taxpayer's gross receipts is "the more valid comparison." *Real Estate Corp. v. Commissioner,* 35 T.C. 610, 614 (1961), affd. 301 F.2d 423 (10th Cir. 1962). We therefore hold that the proceeds of petitioners' silver-waste sales were substantial.

Our conclusions that the silver-waste sales were frequent and substantial weighs heavily against petitioners, as frequency and substantiality of sales often have been held to be the most important objective indicators of whether property falls within the terms of section 1221(1). *Major*

*Realty Corp. v. Commissioner,* 749 F.2d 1483 (11th Cir. 1985), affg. on this issue a Memorandum Opinion of this Court; *Houston Endowment v. United States,* 606 F.2d 77 (5th Cir. 1979). *Suburban Realty Co. v. United States,* 615 F.2d 171, 178 (5th Cir. 1980); *Biedenharn Realty Co. v. United States,* 526 F.2d at 416; *Buono v. Commissioner,* 74 T.C. 187, 200 (1980).[6] Frequency and substantiality of sales, however, are not the sole considerations supporting our conclusion that the silver waste was held for the purpose described in section 1221(1). We also consider the nature of petitioners' business, the relationship of the silver waste to such business, and whether the sales of silver waste were in furtherance of petitioners' business. *Gartrell v. United States,* 619 F.2d 1150, 1155 (6th Cir. 1980); *Broughton v. Commissioner,* 333 F.2d 492, 495 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; *Greene-Haldeman v. Commissioner,* 31 T.C. 1286, 1292-1293 (1959), affd. 282 F.2d 884 (9th Cir. 1960). In the instant case, petitioners' core business was photo-finishing, but petitioners also engaged in certain ancillary activities designed to further such business, such as furnishing photographic products and supplies to the retail outlets where film was dropped off for processing. Petitioners argue that the sale of silver waste was in no way connected with their photo-finishing operation, and that the prospect of selling the silver waste in no way affected the manner in which such enterprise was run. In the instant case, however, we decline to artificially segment what is in reality an integrated business operation. Consequently, we conclude that the silver waste was necessarily and continuously produced in the ordinary course of petitioners' everyday business operations, and, therefore, the regular and frequent sale of the silver waste is most naturally viewed as part of those business operations.

The silver-waste sales comprised more than an insignificant component of petitioners' photo-finishing business, as the silver-waste sales yielded a large part of the profits of such business and accomplished the disposal of a toxic pollutant. Petitioners conducted the silver waste removal

---

[6]*Bramblett v. Commissioner,* T.C. Memo. 1990-296; *Erfurth v. Commissioner,* T.C. Memo. 1987-232; *Norris v. Commissioner,* T.C. Memo. 1986-151.

operation in a businesslike manner, monitoring the efficiency of the extraction process, setting target recovery rates, placing film scraps in the tailing process to harvest the silver they contained, and seeking to maximize the silver content of the silver waste. We also note that petitioners' predecessor, ABC Photo, began selling silver waste in 1958 or 1959, well before the closed-loop processing system was adopted and before environmental regulations required its removal from waste water. Petitioners generated approximately 23,000 pounds of silver waste annually, most of which consisted of flake containing 92 percent silver, a valuable commodity. The sale of the silver waste was closely related to, and occurred in furtherance of, petitioners' photo-finishing business and was more than an "incidental" part of petitioners' photo-finishing business.[7]

Petitioners make much of the fact that they removed the silver waste from their photo-finishing solutions for business reasons unrelated to its sale. Specifically, petitioners were required to extract the silver waste in order to produce developed prints and negatives of marketable quality, to reuse photo-finishing solutions in the closed-loop system, and to comply with environmental regulations governing the level of silver in waste waters discharged from their plants. Petitioners would have removed the silver waste for the foregoing reasons even if it had been valueless. We note, however, that the reasons petitioners removed the silver waste from the photo-finishing solutions are not conclusive of the purpose for which the silver waste was held. *Klarkowski v. Commissioner*, 385 F.2d 398, 400 (7th Cir. 1967). Rather, such reasons are to be weighed with all other evidence indicative of petitioners' holding purpose. Accordingly, we have considered the reasons petitioners have advanced for extracting the silver waste from the photo-finishing solutions, but do not find that they are inconsistent with our finding that petitioners' efforts in regard to

---

[7]Consequently, cases relied upon by petitioners, such as *Kirby Lumber Corp. v. Phinney,* 412 F.2d 598 (5th Cir. 1969); *Hillard v. Commissioner,* 281 F.2d 279 (5th Cir. 1960), revg. 31 T.C. 961 (1959); *United States v. Bennett,* 186 F.2d 407 (5th Cir. 1951); *Albright v. United States,* 173 F.2d 339 (8th Cir. 1949); *Emerson v. Commissioner,* 12 T.C. 875 (1949); *Thompson Lumber Co. v. Commissioner,* 43 B.T.A. 726 (1941), are inapposite to the instant case.

the recovery and sale of the silver waste were an ordinary and necessary part of petitioners' business operations.[8]

We also consider the fact that approximately 60 percent of the silver waste removed from the photo-finishing solutions was attributable to silver compounds removed from photographic paper purchased by petitioners to make prints from film processed by them. Such photographic paper was included in petitioners' inventory. The cost of the paper, including the cost of the silver contained in the paper, was charged against gross receipts as part of the cost of goods sold. Consequently, a portion of the silver which petitioners extracted from the photo-finishing solutions and sold entered their business originally as inventory. Generally, where property is placed in inventory at the time of its acquisition, positive evidence of a change in the purpose for which it is held is required to find that such property has lost its original character. *Duval Motor Co. v. Commissioner*, 264 F.2d 548 (5th Cir. 1959), affg. 28 T.C. 42 (1957); *W.R. Stephens Co. v. Commissioner*, 199 F.2d 665 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; *Luhring Motor Co. v. Commissioner*, 42 T.C. 732, 753 (1964); *R.E. Moorhead & Son, Inc. v. Commissioner*, 40 T.C. 704, 710-711 (1963); *Johnson-McReynolds Chevrolet Corp. v. Commissioner*, 27 T.C. 300, 305 (1956).

We do not find that any intervening event in the developing process caused the silver (that originally was contained in the paper) to be held for any purpose other than the purpose set forth in section 1221(1). Although the silver compounds in the photographic paper were transformed into silver waste by the photo-finishing process, that *physical* and *chemical* change did not cause a change in the *character* or *holding* purpose of the silver contained in the silver waste extracted from the photo-finishing solutions. The silver remained a part of petitioners' photo-finishing

---

[8]Petitioners have cited a number of cases holding that the disposal of property no longer usable in a taxpayer's business results in capital gain or loss because such property is not held "primarily for sale." *Cedarburg Fox Farms, Inc. v. United States*, 283 F.2d 711, 715-716 (7th Cir. 1960); *Hillard v. Commissioner*, 281 F.2d 279 (5th Cir. 1960), revg. 31 T.C. 961 (1959); *Philber Equipment Corp. v. Commissioner*, 237 F.2d 129 (3d Cir. 1956), revg. 25 T.C. 88 (1955); *Gamble v. Commissioner*, 68 T.C. 800, 811-812 (1977); *Kirk v. Commissioner*, 47 T.C. 177, 192-193 (1966); *Tesche v. Commissioner*, 33 T.C. 122, 127 (1959); *McDonald v. Commissioner*, 23 T.C. 1091, 1097-1100 (1955); *A. Benetti Novelty Co. v. Commissioner*, 13 T.C. 1072, 1077-1079 (1949). We have considered the foregoing cases, as well as others cited by petitioners, but find them distinguishable.

operation. From the very time petitioners acquired the photographic paper containing the silver halides, they intended to recover part of the cost of their expenditure by the sale of the silver waste. The fact that the valuable components of the paper were sold to different purchasers, i.e., the paper in the form of prints to its film developing customers and the silver to Metalex, did not effect a change in petitioners' initial intent.

Although the 40 percent of the silver waste derived from film delivered by petitioners' customers to petitioners for developing did not originally enter petitioners' business as inventory, we do not find that such circumstance warrants the conclusion that such portion of the silver waste was held for a purpose other than sale after it was extracted from the photo-finishing solutions.[9] We note also that, during the greater part of the years in issue, petitioners were under a contractual obligation to sell the silver waste provided in the course of their photo-finishing business to Metalex. The existence of such a preexisting sale arrangement indicates that the property sold pursuant to such an arrangement was held primarily for sale. *S&H, Inc. v. Commissioner*, 78 T.C. 234, 244 (1982).

Petitioners argue that their lack of efforts to market the silver waste indicates that the silver waste was not held primarily for sale. We do not find petitioners' argument persuasive, however, because market conditions made it unnecessary for petitioners to engage in any sales efforts to dispose of the silver waste—refiners actively competed to purchase the silver waste. We thus do not attach much significance to the absence of such activities. *Suburban Realty Co. v. United States*, 615 F.2d 171, 179 (5th Cir. 1980); *Houston Endowment Inc. v. United States*, 606 F.2d 77, 83 (5th Cir. 1979); *Daugherty v. Commissioner*, 78 T.C. 623, 632-633 (1982); *Brady v. Commissioner*, 25 T.C. 682, 690 (1955).

Petitioners also argue that they made no improvements to the silver waste before it was sold to refiners, and that such absence suggests that it was not held primarily for sale.

---

[9] Furthermore, the factors discussed above, such as frequency and substantiality of sales, and the relationship of the sales to petitioners' business, all indicate that the portion of the silver waste attributable to film was held primarily for sale even if such portion is not part of petitioners' inventory.

While the failure to improve property sold indicates that such property is not held primarily for sale, *Adam v. Commissioner*, 60 T.C. 996, 1000 (1973), in the instant case such circumstance does not outweigh the other evidence, discussed above, indicating that the silver waste was held for the purpose described in section 1221(1), especially in view of the fact that much of the silver waste contained 92 percent silver.

Respondent also points to the fact that petitioners initially reported the gain from the sale of silver waste as ordinary income on their tax returns for the years in issue, and only recharacterized it upon incurring a large capital loss in a year subsequent to the years in issue. While the treatment of an item on a return generally is not included in the list of factors to be considered in determining whether property is a capital asset, such treatment constitutes some evidence of its character, which must be weighed along with all other relevant evidence in reaching a decision. *Waring v. Commissioner*, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court; *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 663-664, 703-704 (1980); *Siewert v. Commissioner*, 72 T.C. 326, 337 (1979); *Estate of Swayne v. Commissioner*, 43 T.C. 190, 200 (1964). See also *Riley v. Commissioner*, 37 T.C. 932 (1962), affd. 328 F.2d 428 (5th Cir. 1964) (taxpayer's self description of activity constitutes evidence of its nature). In sum, based upon our weighing of the other factors in the instant case, we think petitioners had it right the first time.[10]

Respondent further points to petitioners' deduction of the expenses connected with the silver waste, such as the cost of silver compounds in the photographic paper petitioners used to make prints and the expenses of extracting it from the photo-finishing solutions and waste waters. Petitioners maintain that such expenses were deductible even after recharacterizing the proceeds of silver-waste sales as short-term capital gain on their amended returns.

---

[10]At trial, petitioners offered no evidence to explain their original return position with respect to the proceeds of silver-waste sales. On brief, petitioners suggest that, in the absence of a net capital loss, petitioners had no need to determine whether the silver waste was a capital asset.

As a general matter, the expenses of acquisition or creation of a capital asset must be added to the taxpayer's basis in the asset and offset against the proceeds of its sale, even if such expenses otherwise would be allowable deductions under section 162. *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345, 354 (1971); *Woodward v. Commissioner,* 397 U.S. 572, 574-575 (1970); *Estate of Boyd v. Commissioner,* 76 T.C. 646, 660 (1981); *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. at 577-578.

Petitioners rely upon *H.G. Fenton Material Co. v. Commissioner,* 74 T.C. 584, 592 (1980), to sustain their deduction of expenses connected with the silver waste. We, however, distinguish *H.G. Fenton* on its facts. In *H.G. Fenton,* we permitted the taxpayer to deduct the cost of dumping fill on its land even though such dumping may have benefited the land. Unlike *H.G. Fenton,* petitioners' expenditures resulted in more than a speculative or incidental benefit to a capital asset; rather such expenditures resulted in the creation of property with considerable value, which value was quickly and continuously realized by petitioners. Such facts do not indicate to us that petitioners created an "incidental" capital asset in the instant case. Petitioners should not be entitled to deduct the costs associated with the silver waste and then claim capital asset treatment on its sale. Accordingly, petitioners' treatment of the expenses associated with the silver waste as deductible costs weighs against classifying the silver waste as a capital asset.[11] Based on the foregoing, we hold that the silver waste is property held by petitioners primarily for sale to customers in the ordinary course of their business. We, therefore, find it unnecessary to reach respondent's alterna-

---

[11]Respondent also argues that the fact that the silver waste was held for only a short time prior to its disposal indicates that the silver waste was held for sale. *Patterson v. Belcher,* 302 F.2d 289, 294 (5th Cir. 1962); *Sovereign v. Commissioner,* 32 T.C. 1350, 1359 (1959), affd. 281 F.2d 830 (7th Cir. 1960); *Bauschard v. Commissioner,* 31 T.C. 910, 917 (1959), affd. 279 F.2d 115 (6th Cir. 1960); *Philbin v. Commissioner,* 26 T.C. 1159, 1164 (1956). Sec. 1221, however, does not condition capital asset status on any holding period. Sec. 1.1221-1(a), Income Tax Regs. (stating that, in determining whether property is a "capital asset," the period for which it is held is immaterial); *Byram v. United States,* 705 F.2d 1418, 1425 (5th Cir. 1983). See also *Durliat v. Commissioner,* T.C. Memo. 1982-563 (purchase and sale of property on the same day did not prevent such property from being considered a capital asset). Moreover, business considerations required prompt disposal of the silver waste once it was collected. We therefore find the short holding period to be a neutral factor in the instant case.

tive contentions concerning petitioners' basis in the silver waste and the applicability of the tax benefit rule.

To reflect concessions and stipulations on other issues,

*Decision will be entered under Rule 155.*